# 24-973-cv

## 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

*for the*

### 𝔖𝔢𝔠𝔬𝔫𝔡 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

———————————————◆———————————————

R. MICHAEL CESTARO,

*Plaintiff-Appellant,*

– v. –

CLARISSA M. RODRIGUEZ, Chair, New York State Workers' Compensation
Board, in her individual and official capacity, DAVID WERTHEIM, Former
Acting Executive director and Former General Counsel, New York State
Workers' Compensation Board, in his individual and official capacity,
HEATHER MACMASTER, Acting General Counsel, New York State Workers'
Compensation Board, in her individual and Official Capacity, MADELINE H.
PANTZER, Former Project Director and Chief of Adjudication, New York State
Workers' Compensation Board, in her individual and Official Capacity,

*Defendants-Appellees.*

—————————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX
## FOR PLAINTIFF-APPELLANT

RICHARD L. SULLIVAN
LAW OFFICE OF RICHARD L. SULLIVAN
*Attorney for Plaintiff-Appellant*
6558 Fourth Section
Brockport, New York 14420
(307) 250-2462

COUNSEL PRESS   (800) 4-APPEAL • (330653)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................. ii

STATEMENT OF THE CASE ..............................................................1

JURISDICTIONAL STATEMENT .......................................................7

ISSUES PRESENTED..........................................................................7

STANDARD OF REVIEW ..................................................................8

ARGUMENT .......................................................................................9

    POINT I

    THE DISTRICT COURT ERRED IN GRANTING SUMMARY
    JUDGMENT IN DEFENDANTS' FAVOR ON THE BASIS OF
    THE MT. HEALTHY DEFENSE ........................................................9

    A.    The lower court overlooked the legal framework governing
        claims of First Amendment retaliation against public
        employees, which requires a threshold inquiry into the
        question of whether Plaintiff-Appellant's speech was
        constitutionally protected, before the Mt. Healthy defense
        can be considered ..........................................................11

    B.    Plaintiff-Appellant met his burden of making a prima facie
        showing of retaliation on the basis of constitutionally-
        protected speech ............................................................16

    C.    Defendants would not have taken the same action but for
        Plaintiff-Appellant's Constitutionally-protected speech.....................22

    POINT II

    THE LOWER COURT ERRED IN DECLINING TO APPLY THE
    PICKERING TEST. THE EVIDENCE MAKES CLEAR THAT
    DEFENDANTS DID NOT HAVE A REASONABLE BELIEF
    THAT PLAINTIFF-APPELLANT'S SPEECH WAS LIKELY
    TO CAUSE WORKPLACE DISRUPTION ................................................30

CONCLUSION ........................................................................................36

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

Anderson v. State of New York, Office of Court Admin. of
    Unified Court System,
    614 F. Supp. 2d 404 (S.D.N.Y. 2009) ..................................................22

Anemone v. Metro. Transp. Auth.,
    629 F.3d 97 (2d Cir. 2011) ........................................................... *passim*

Balchan v. City Sch. Dist. of New Rochelle,
    2023 WL 4684653 (S.D.N.Y. 2023) .................................................21

Bay v. Times Mirror Magazines, Inc.,
    936 F.2d 112 (2d Cir. 1991) .............................................................33

Binder v. Long Island Lighting Co.,
    933 F.2d 187 (2d Cir. 1991) .............................................................33

Blum v. Schlegel,
    18 F.3d 1005 (2d Cir. 1994) .............................................................11

Brock v. Casey Truck Sales, Inc.,
    839 F.2d 872 (2d Cir. 1988) .............................................................14

Chaplinsky v. New Hampshire,
    315 U.S. 568, 62 S. Ct. 766, 86 L. Ed. 1031 (1942) .........................20

Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.,
    444 F.3d 158 (2d Cir. 2006) .............................................................22

Cobb v. Pozzi,
    363 F.3d 89 (2d Cir. 2004) ...............................................................22

Connick v. Myers,
    461 U.S. 138 (1983) .........................................................................11

Cotarelo v. Vill. of Sleepy Hollow Police Dep't,
    460 F.3d 247 (2d Cir. 2006) .............................................................11

Davi v. Hein,
    2023 U.S. App. LEXIS 7087, 2023 WL 2623205 ............................35

Dillon v. Morano,
    497 F.3d 247 (2d Cir. 2007) .......................................................... 16, 34

Garcetti,
    547 U.S. 418 ................................................................................. 12, 17

Greenwich Citizens Comm.,
    77 F.3d 32 ............................................................................................13

Heil v. Santoro,
    147 F.3d 103 (2d Cir. 1997) .......................................................... 13, 32

Higdon v. Jackson,
    393 F.3d 1211 (11th Cir. 2004) ............................................................22

International Society for Krishna Consciousness v. Lee,
    505 U.S. 830 (1992) ..............................................................................20

Johnson v. Ganim,
    342 F.3d 105 (2d Cir. 2003) .................................................................11

Kravitz v. Purcell,
    87 F.4th 111 (2d Cir. 2023) ....................................................................8

Lane v. Franks,
    572 U.S. 228 (2014) ..............................................................................16

Light v. City of New Haven,
    No. 3:22-cv-425 (JAM) (U.S.D.C.  Dist. of Conn. 2024)....................21

Locurto v. Guliani,
    447 F.3d 159 (2d Cir. 2006) .................................................................17

Matthews v. City of New York,
    779 F.3d 167 (2d Cir 2015) ...............................................................8, 17

Melzer v. Bd. of Educ.,
    336 F.3d 185 (2d Cir. 2003) .................................................................32

Morris v. Lindau,
    196 F.3d 102 (2d Cir. 1999) .......................................................... 14, 30

Morrison v. Johnson,
    429 F.3d 48 (2d Cir. 2005) ...................................................................11

Mt. Healthy City School District Bd. of Educ. v. Doyle,
    429 U.S. 274 (1976) ..................................................................... *passim*

Nagle v. Marron,
    663 F.3d 100 (2d Cir. 2011) ................................................12

Pappas v. Giuliani,
    290 F.3d 143 (2d Cir. 2002) .................................................32

Persaud v. City of New York,
    2024 U.S. Dist. LEXIS 87727 (S.D.N.Y. No. 22-cv-2919
    (May 14, 2014)) ......................................................... 25, 26, 35

Pickering v. Bd. of Educ.,
    391 U.S. 563 (1968) ...................................................... *passim*

Piesco v. City of New York,
    933 F.2d 1149 (2d Cir. 1991) ...............................................30

Pisano v. Mancone,
    08 Civ. 1045 (KMW) (S.D.N.Y. Mar. 21, 2011) ...................................30

Piscottano v. Murphy,
    511 F.3d 247 (2d Cir. 2007) .......................................... 32, 33

R.A.V. v. City of St. Paul,
    505 U.S. 377, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992) ..................20

Rabbi Jacob Joseph Sch. v. Province of Mendoza,
    425 F.3d 207 (2d Cir. 2005) .................................................7

Rankin,
    483 U.S. 387 ................................................................18

Rupp v. City of Buffalo,
    91 F.4th 623 (2024) .........................................................19

Salve Regina College v. Russell,
    499 U.S. 225, 113 L. Ed. 2d 190, 111 S. Ct. 1217 (1991) ......................8

Smith v. County of Suffolk,
    776 F.3d 114 (2015) .................................................. 24, 25

Snyder v. Phelps,
    562 U.S. 458 (2011) .........................................................20

Sousa v. Roque,
    578 F.3d 164 (2d Cir. 2009) ........................................................ 14, 15

Waters v. Churchill,
    511 U.S. 661, 114 S. Ct. 1878, 128 L. Ed. 2d 686 (1994) ...................................33

Williams v. Town of Greenburgh,
    535 F.3d 71 (2d Cir. 2008) ........................................................12

Wyatt v. City of Boston,
    35 F.3d 13 (1st Cir. 1994) ........................................................22

X-Men Security, Inc. v. Pataki,
    196 F.3d 56 (2d Cir. 1999) ........................................................20

Zervos v. Verizon N.Y., Inc.,
    252 F.3d 163 (2d Cir. 2001) ........................................................9

## Statutes and Other Authorities:

U.S. Const., amend. I ........................................................ *passim*

U.S. Const., amend. XIV ........................................................5, 23

N.Y. Const., art. I, § 8 ........................................................5

28 U.S.C. § 1291 ........................................................7

42 U.S.C. § 1983 ........................................................4, 7

Fed. R. Civ. P. 56(a) ........................................................33

BLACK'S LAW DICTIONARY 435 (6th ed. 1990) ........................................................9

Ofer Raban, The Free Speech of Public Employees at a Time of Political
    Polarization: Clarifying the Pickering Balancing Test,
    60 Hous. L. Rev. 653 (2023) ........................................................ 18, 19

## STATEMENT OF THE CASE

This Appeal arises from an action in the Southern District of New York, in which Plaintiff-Appellant R. Michael Cestaro, a Compensation Claims Referee with the New York State Workers' Compensation Board ("WCB"), seeks compensation for damages resulting when the defendants – Plaintiff-Appellant's supervisors at the WCB – rescinded a promotion Plaintiff-Appellant had been offered and accepted, to Senior Compensation Claims Referee, promptly upon viewing a 23-second video posted to TikTok, in which Plaintiff-Appellant was heard arguing with a New Jersey Transit ("NJT") conductor who demanded Plaintiff-Appellant pull his mask up over his nose and mouth.

Plaintiff-Appellant was hired in June 2019 as a Compensation Claims Referee ("CCR"), to conduct workers' compensation law hearings, including: the establishment or disallowance of claims, awards of compensation, and denial of medical treatment. Appearing at these hearings are the claimants and counsel, counsel for insurance carriers, and witnesses. During his employment at the WCB, Plaintiff-Appellant has received nothing but satisfactory performance evaluations with uniformly positive and laudatory comments.

On or about July 15, 2021, the Workers' Compensation Board posted a vacancy for a Senior Compensation Claims Referee position covering Manhattan and White Plains. Plaintiff-Appellant applied and interviewed for the Senior

1

Compensation Claims Referee position. On or about August 4, 2021, he was offered and he accepted the promotion. He was to commence work as a Senior Compensation Claims Referee on Thursday, September 2, 2021.

On Saturday, August 28, 2021, Plaintiff-Appellant set out to travel to Lyndhurst, New Jersey for personal reasons and boarded a New Jersey Transit ("NJT") train at New York Penn Station. En route to his final destination, Plaintiff-Appellant switched to a 5:36 p.m. train in Secaucus, New Jersey, for a six-minute ride to his final destination, the Kingsland station in Lyndhurst, New Jersey. Plaintiff-Appellant, who was fully-vaccinated against the COVID-19 virus and was wearing a face mask, sequestered himself in a corner as far away as he could from other passengers and as close to the exit of the train as possible. Plaintiff-Appellant suffers several visual impairments and conditions, including the loss of most vision in his right eye. Wearing a surgical mask fully over his nose significantly impairs the inferior section of plaintiff's right eye, which was the only area in his entire visual field that provides him with useful binocularity and depth perception. During part of the six-minute train ride, Plaintiff-Appellant lowered his mask under his chin to look at his phone, which also serves as an assistive device for his visual impairment, so that he could retrieve his electronic train ticket to show to the conductor. Plaintiff-Appellant purchased the electronic ticket at home earlier that day. Given his depth perception limitations, he planned to keep the mask lowered

2

so that he could safely step down onto the pavement from the highly-elevated and dangerous train stairs.

About a minute before the train arrived in Lyndhurst, a NJT conductor approached Plaintiff-Appellant and ordered him to pull up his mask. Unbeknownst to Plaintiff-Appellant, a passenger in the same train car as him, whose identity remains unknown and who surreptitiously video recorded the following argument between Plaintiff-Appellant and the conductor:

> CESTARO: This is a political symbol.
> CONDUCTOR: Listen to me.
> CESTARO: No. Listen to me.
> CONDUCTOR: Guess what.
> CESTARO: I don't have to listen to you.
> CONDUCTOR: With New Jersey Transit, the police can come.
> CESTARO: Fine.
> CONDUCTOR: (Inaudible/unclear) You can get a summons.
> CESTARO: Fine. Fine.
> CONDUCTOR: You are just lucky that you are getting off at Kingsland. It's just a courtesy to everyone else.
> CESTARO: Fine. Then I'll challenge it in court.
> CONDUCTOR: Absolutely you can.
> CESTARO Fine.
> CONDUCTOR: Challenge it.
> CESTARO: Fine. But it's unconstitutional. The government can't compel me to do this. If you want to be an obedient dog, you can.

(A: 748). During this encounter, Plaintiff-Appellant was dressed casually, and at no time identified himself as an employee of the WCB or indicated his job title or the name of his employer, or otherwise made any reference to the fact that he was

a compensation claims referee or an attorney. The train arrived in Lyndhurst, and Plaintiff-Appellant exited the train as planned. That same day, the video was posted to the public TikTok account of Carly Shapiro, a resident of New York, New York. The length of the posted video was 23 seconds.

The following Monday, August 30, 2021, Daniel Elias, a workers' compensation law attorney who appears regularly before the WCB, emailed the link to the video to defendant Madeline Pantzer, who was then Plaintiff-Appellant's immediate supervisor. On Tuesday, August 31, 2021, Pantzer sent Plaintiff-Appellant an email revoking his promotion to Senior Compensation Claims Referee, offering no explanation. Plaintiff-Appellant later emailed a request for a written explanation for the reason the promotion was rescinded, and received no response. Plaintiff-Appellant continued to be employed as a CCR at the WCB, and continues in that capacity to date. He has received uniformly positive evaluations and given his stellar performance he has and continues to serve, along with just a handful of administrative law judges state-wide, in adjudicating highly public and politically sensitive cases.

Plaintiff-Appellant brought the underlying action under the U.S. Constitution, the New York State Constitution, and 42 U.S.C. § 1983, maintaining that the defendants' revocation of his pending promotion violated his free speech

rights under the First and Fourteenth Amendments to the United States Constitution and Article I, § 8 of the New York State Constitution.

Following discovery, by written motion dated December 4, 2023, defendants jointly moved for summary judgment on all of Plaintiff-Appellant's claims. In support of their motion, the defendants invoked qualified immunity, and also asserted that, pursuant to <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563 (1968) and subsequent authority, they were not liable for a violation of Plaintiff-Appellant's First Amendment rights because he did not speak as a citizen on a matter of public concern and because, even if he had spoken as a citizen on a matter of public concern, they took the challenged action based on a reasonable belief that his speech would likely cause disruption in the workplace and that such disruption outweighed the First Amendment value of the speech. Further, the defendants argued that, pursuant to <u>Mt. Healthy City School District Bd. of Educ. v. Doyle</u> 429 U.S. 274 (1976), they were shielded from liability on the grounds that they would have taken the same action even in the absence of Plaintiff-Appellant's Constitutionally-protected speech.

Plaintiff-Appellant opposed Defendants' motion in papers dated December 27, 2023.

By Decision and Order dated March 12, 2024, the District Court of the Southern District of New York (Hon. Denise L. Cote) granted summary judgment

in defendants' favor.  The court declined to address the issues of qualified immunity or the Pickering factors, merely noting in a footnote, without elaboration, that "[t]he defendants rely on the defenses offered by both Pickering v. Board of Ed. Of Tp, High School Dist., 205, Will, Cnty, Illinois, 391 U.S. 563 (1968) and Mt. Healthy 429 U.S. 274, 285-86 (1977).  It is only necessary to address their arguments under Mt. Healthy" (SPA at 10).  In entering a ruling solely on the grounds of the "Mt. Healthy defense," the court found that "any reasonable jury would find that Cestaro's promotion would have been revoked even absent any desire on the Defendants' part to punish him in retaliation for his allegedly protected speech."  In the court's view, "even if the plaintiff had not stated his views about the unconstitutionality of mask mandates, the defendants would have revoked the promotion for his other conduct, namely, behaving unprofessionally, insulting a worker, and failing to follow the rules and regulations about wearing masks on public transport during a global health crisis" (SPA at 15).[1]

A Notice of Appeal was timely filed on January 19, 2024.

---

[1] References to "A" are to the Petitioner-Appellant's Appendix.  References to "SPA" are to the Petitioner-Appellant's Special Appendix.

## JURISDICTIONAL STATEMENT

The District Court has subject matter jurisdiction over the underlying action brought to vindicate Plaintiff's civil rights under 42 U.S.C. § 1983. The lower court's decision granting summary judgment to defendants constitutes a final order – i.e., "an order of the district court that ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." Rabbi Jacob Joseph Sch. v. Province of Mendoza, 425 F.3d 207, 210 (2d Cir. 2005) (quotation marks omitted). This Court has jurisdiction over appeals from final orders and decisions of the district court pursuant to 28 U.S.C.S. § 1291.

## ISSUES PRESENTED

1.    Whether the District Court erred in its application of the Mt. Healthy defense by reaching the question of whether the defendants would have taken the challenged action even in the absence of Plaintiff-Appellant's speech without first determining whether Plaintiff-Appellant's speech was Constitutionally protected.

2.    Whether the District Court erroneously found that the defendants are shielded from liability by virtue of Mt. Healthy City School District Bd. of Educ. v. Doyle, 429 U.S. 274 (1976) on the grounds that, even if Plaintiff-Appellant's Constitutionally-protected speech played a role in defendants' adverse employment

7

decision, no reasonable fact-finder could have concluded that Plaintiff-Appellant's promotion would not have been revoked anyway, for reasons other than his protected speech.

3.    Whether the District Court erred in failing to find, under the balancing test set forth in Pickering v. Bd. of Educ., 391 U.S. 563 (1968), that Plaintiff-Appellant was entitled to summary judgment because, under the facts of the case, no reasonable trier of fact could conclude that Plaintiff-Appellant did not speak as a private citizen on a matter of public concern or that defendants reasonably believed his speech was likely to cause disruption in the workplace.

## STANDARD OF REVIEW

It is well-established that this Court reviews a District Court's grant of summary judgment de novo.  Matthews v. City of New York, 779 F.3d 167 (2d. Cir 2015); see Kravitz v. Purcell, 87 F.4th 111, 118 (2d Cir. 2023).  De novo review is review without deference.  See Salve Regina College v. Russell, 499 U.S. 225, 238, 113 L. Ed. 2d 190, 111 S. Ct. 1217 (1991) ("[w]hen de novo review is compelled, no form of appellate deference is acceptable").  When this Court reviews a District Court's decision de novo, "we take note of it, and study the

8

reasoning on which it is based. However, our review is independent and plenary; as the Latin term suggests, we look at the matter anew, as though the matter had come to the courts for the first time," Zervos v. Verizon N.Y., Inc., 252 F.3d 163, 168 (2d. Cir 2001) (citing BLACK'S LAW DICTIONARY 435 [6th ed. 1990] ["defining 'de novo' as 'anew' and 'afresh'"]), id. at 168.

## ARGUMENT

### POINT I

### THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT IN DEFENDANTS' FAVOR ON THE BASIS OF THE MT. HEALTHY DEFENSE

The District Court based its decision granting summary judgment solely on the "Mt. Healthy defense" – i.e., that "any reasonable jury would find that Cestaro's promotion would have been revoked even absent any desire on the Defendants' part to punish him in retaliation for his allegedly protected speech" (SPA at 15) (emphasis added).  This is so, the court found, because "even if the plaintiff had not stated his views about the unconstitutionality of mask mandates, the defendants would have revoked the promotion for his other conduct, namely, behaving

9

unprofessionally, insulting a worker, and failing to follow the rules and regulations about wearing masks on public transport during a global health crisis" (SPA at 15). This was error.

First, the lower court made a fundamental misstep in addressing the question of whether defendants "would have revoked the promotion for his other conduct" without first making a reasoned determination on the question of whether Plaintiff-Appellant's speech was, whether wholly or partially, constitutionally protected. The legal framework for analyzing claims of First Amendment retaliation by public employees makes clear that this inquiry must happen first. This is for good reason, because the <u>Mt. Healthy</u> analysis cannot logically proceed otherwise. And, to answer the threshold question the lower court bypassed, it is respectfully submitted that the entirety of Plaintiff-Appellant's speech aboard the New Jersey Transit train was protected speech.

Second, the District Court erred in finding that no reasonable fact-finder could have concluded that Plaintiff-Appellant's promotion would not have been revoked anyway, for reasons other than Plaintiff-Appellant's constitutionally-protected speech. In fact, the record makes plain that the revocation of Plaintiff-Appellant's promotion was due entirely to the speech he engaged in with the train conductor – all of which was constitutionally-protected.

1. **The lower court overlooked the legal framework governing claims of First Amendment retaliation against public employees, which requires a threshold inquiry into the question of whether Plaintiff-Appellant's speech was constitutionally protected, before the Mt. Healthy defense can be considered.**

Of course, by accepting government employment, public employees do not "relinquish First Amendment rights" as citizens to comment upon "matters of public concern." Connick v. Myers, 461 U.S. 138, 147-48 (1983). "To survive summary judgment on a First Amendment retaliation claim, a public employee 'must bring forth evidence showing that [1] he has engaged in protected First Amendment activity, [2] he suffered an adverse employment action, and [3] there was a causal connection between the protected activity and the adverse employment action.'" Anemone v. Metro. Transp. Auth., 629 F.3d 97, 114 (2d Cir. 2011). "[T]he causal connection must be sufficient to warrant the inference that the protected speech was a substantial motivating factor in the adverse employment action." Cotarelo v. Vill. of Sleepy Hollow Police Dep't, 460 F.3d 247, 251 (2d Cir. 2006) (quoting Blum v. Schlegel, 18 F.3d 1005, 1010 [2d Cir. 1994]); see also Morrison v. Johnson, 429 F.3d 48, 51 (2d Cir. 2005) (framing the third, "causation" prong as asking whether "the speech was at least a substantial or motivating factor in the adverse employment action" (quoting Johnson v. Ganim, 342 F.3d 105, 112 [2d Cir. 2003]).

The first prong, above, that a public employee has engaged in protected First

Amendment activity, entails an inquiry into whether he spoke as a private citizen, as opposed to pursuant to his official duties, and whether he spoke on a matter of public concern. "Regardless of the factual context, we have required a plaintiff alleging retaliation to establish speech protected by the First Amendment." Williams v. Town of Greenburgh, 535 F.3d 71, 76 (2d Cir. 2008). To determine whether or not a plaintiff's speech is protected, a court must begin by asking "whether the employee spoke as a citizen on a matter of public concern." Garcetti, 547 U.S. at 418. If the court determines that the plaintiff either did not speak as a citizen or did not speak on a matter of public concern, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." Id.

Even where a public employee plaintiff has made out a prima facie retaliation claim, the government may nonetheless be entitled to summary judgment by establishing "its entitlement to a relevant defense." Anemone v. Metro. Transp. Auth., 629 F.3d 97, 114 (2d Cir. 2011). In Mount Healthy City School District Board of Education v. Doyle, 429 U.S. 274 (1976), the Supreme Court recognized a defense to a claim of retaliation for Constitutionally protected speech in the context of a public employee in cases where the "protected speech could not substantially cause an adverse action" on the grounds that "the employer would have taken that action in any event." Nagle v. Marron, 663 F.3d 100, 111 (2d Cir. 2011). The plaintiff's freedom from retaliation for Constitutionally-protected speech is "sufficiently

12

vindicated if such an employee is placed in no worse a position than if he had not engaged in the [protected] conduct." <u>Mt. Healthy</u>, 429 U.S. at 285-86. This "principle prevents an employee who engages in unprotected conduct from escaping discipline for that conduct by the fact that it was related to protected conduct," <u>Heil v. Santoro, 147 F.3d 103</u>, 110 (2d. Cir. 1997). "[A]lthough the language in <u>Mt. Healthy</u> refers to the plaintiff's conduct, the [Supreme] Court's analysis, properly understood, attempts to weigh the impact of the defendant's impermissible reason on the defendant's decision to act," such that a defendant can "avoid liability by showing that it would have taken the same action in the absence of the impermissible reason." <u>Greenwich Citizens Comm.</u>, 77 F.3d at 32. The burden is on the government to make out the defense. <u>Heil</u>, 147 F.3d at 110.

It is respectfully submitted, the three-part <u>prima facie</u> showing this Court set forth in <u>Anemone</u>, as outlined in the preceding paragraph, must be undertaken by a District Court before the possibility of the applicability of the <u>Mt. Healthy</u> defense is considered. In other words, <u>Mt. Healthy</u> applies only where it has already been established that there was a First Amendment violation – which, in this context, entails an inquiry into whether the public employee spoke as a private citizen on a matter of public concern. That this view of the law – that a court may not proceed to apply <u>Mt. Healthy</u> until it has determined that a public employee alleging First Amendment retaliation has made a <u>prima facie</u> showing to include a constitutional

13

violation – also comports with simple logic. Indeed, only after this threshold question has an answer is it even logically possible to answer the subsequent question, whether the same action would have been taken but for the constitutionally-protected speech.

This view has support in Mt. Healthy itself: the defense applies where it can be established "by a preponderance of the evidence that [the defendant] would have taken the same adverse employment action even in the absence of the protected conduct." Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999) (quoting Mt. Healthy, 429 U.S. at 287) (internal quotations omitted) (emphasis added). This view finds support in the cases laying out the threshold showing any plaintiff in this context must make – which the District Court must then analyze. See Sousa v. Roque, supra, 578 F.3d 164, 169-70 (2d Cir. 2009) ("[i]t is established law in this Circuit that, regardless of the factual context, we have required a plaintiff alleging retaliation to establish speech protected by the First Amendment" (citations omitted). And, this Court has plainly stated that the Mt. Healthy defense is available in cases where the employer does not dispute that there is evidence of an impermissible reason for the adverse employment action but the basis for the adverse action is a mixture of permissible and impermissible reasons. See Brock v. Casey Truck Sales, Inc., 839 F.2d 872, 877-78 (2d Cir. 1988) ("[t]o proceed correctly, the fact-finder who concludes a case by applying Mt. Healthy will have already found, either explicitly

or implicitly, that the plaintiff has sustained his burden of proving the existence of an improper reason for the adverse action") (emphasis added); see Sousa v. Roque, 578 F.3d 164, 169-70 (2d Cir. 2009) ("[i]t is established law in this Circuit that, '[r]egardless of the factual context, we have required a plaintiff alleging retaliation to establish speech protected by the First Amendment'").

Had the District Court proceeded correctly, it would have set forth a reasoned answer to the threshold question, necessary to the determination of whether the Mt. Healthy defense applies, of whether Plaintiff-Appellant's speech was or was not – or was wholly or partially – protected by the First Amendment. An answer to this question is required, logically, if there is to be a coherent answer to the question whether the same action would have been taken but for the protected speech.[2] Having not answered the threshold question, the lower court's reasoning as to whether the defendants would have taken the same action in the absence of Plaintiff-

_____

[2] Adding to the confusion, the District Court does appear, inexplicably and without any analysis or reasoning, to have arrived somehow at the peculiar notion that only so much of Plaintiff-Appellant's argument with the train conductor *as actually referenced the Constitution* can even conceivably be Constitutionally-protected speech. The court stated: "even assuming, arguendo, that the defendants improperly considered Cestaro's statement that the NJT's rule requiring masks was "unconstitutional" in deciding to revoke his promotion, they have amply demonstrated with undisputed evidence that they would have revoked it even in the absence of that statement" (SPA: 11). Plaintiff-Appellant has never taken a position other than that the entirety of his speech to the conductor was protected, including in his briefs to the lower court on summary judgment. And, of course, this view finds no support in the law; and, the lower court provides no clue in its decision why this understanding of protected speech is the correct one. This odd assumption highlights the importance of a District Court undertaking the analysis of public employee First Amendment retaliation cases in the correct order, since the lower court here has provided this Court with no basis upon which to examine its reasoning.

Appellant's protected speech cannot be answered. Since the lower court here failed to make any determination whether Plaintiff-Appellant met his burden of the three-prong prima facie showing outlined in Anemone, above, it was error to proceed to the Mt. Healthy analysis, and to grant summary judgment to the defendants on that basis.

**2. Plaintiff-Appellant met his burden of making a prima facie showing of retaliation on the basis of constitutionally-protected speech**

As noted, to survive summary judgment on a First Amendment retaliation claim, a public employee must bring forth evidence showing that "[1] he has engaged in protected First Amendment activity, [2] he suffered an adverse employment action, and [3] there was a causal connection between the protected activity and the adverse employment action." Dillon v. Morano, 497 F.3d 247, 251 (2d Cir. 2007); see Anemone v. Metro. Transp. Auth., 629 F.3d at 114 (2d Cir. 2011). Plaintiff-Appellant amply met this burden.

To begin, Plaintiff-Appellant's speech aboard the New Jersey Transit train was constitutionally-protected. This is so because, as is manifestly clear from the evidence, he spoke as a private citizen, on a matter of public concern. See Lane v. Franks, 572 U.S. 228 (2014) (the First Amendment "protects speech uttered by [a public] employee in his or her capacity as a citizen regarding a matter of public

16

concern"; see Garcetti, 547 U.S. at 417; see Matthews v. City of New York, 779 F.3d 167 (2d Cir. 2015). The question whether the employee spoke as a citizen on a matter of public concern is ordinarily treated as a matter of law to be decided on the whole record, taking into account the content, form, and context of the speech in question. Locurto v. Guliani, 447 F.3d 159, 173 (2d Cir. 2006).

Here, Plaintiff-Appellant was dressed in casual clothing on a Saturday morning, he made no reference whatsoever to his profession or status as an attorney or an administrative law judge, and the topic of the conversation with the train conductor had nothing whatsoever to do with the subject of Plaintiff-Appellant's employment at the WCB. Of course, there has never been any suggestion that Plaintiff-Appellant's speech on the New Jersey Transit train was made pursuant to his official duties as an Administrative Law Judge with the New York State Workers Compensation Bureau, as opposed to as a private citizen. Certainly, there is no suggestion that his conversation with the train conductor was official WCB business. Clearly, Plaintiff-Appellant spoke only as a private citizen.

And, the facts clearly show that Plaintiff-Appellant's speech aboard the New Jersey Transit train – in its entirety – was on a matter of public concern. In fact, in the span of the 23-second video, Plaintiff expressed at least three distinct but interrelated ideas in what he believed to be a private conversation: (1) that mask mandates are unconstitutional ("it's unconstitutional. The government can't compel

17

me to do this"); (2) that wearing a mask was unproductive and therefore a form of virtue signaling ("[t]his is a political symbol"); and (3) that submitting unquestioningly to dictates of the government is demeaning to a free citizen ("Fine. Then I'll challenge it in court"; "If you want to be an obedient dog, you can"). All of these ideas were widely debated in public at the time this conversation took place.

The lower court, of course, focused on the Plaintiff's use of the phrase "obedient dog,"[3] which it found "disrespectful" (Order at 14). Whether or not a trier of fact would agree with that opinion, nothing about Plaintiff-Appellant's use of that term in this context renders the comment beyond the scope of First Amendment protection. "The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." Rankin, 483 U.S. at 387. Plaintiff-Appellant obviously intended this as

---

[3] To the extent that Defendants disagree as to what was meant by the "obedient dog" comment, the case should be remanded for further development of the record. As Professor Ofer Raban, notes, "Ambiguity of meaning calls for meticulous judicial factfinding. Such ambiguity may have many causes—from the use of vague or ambiguous words, to the deployment of expressive devices like sarcasm, the use of satire, or a hyperbole (which was allegedly the case in Rankin), See The Free Speech of Public Employees at a Time of Political Polarization: Clarifying the Pickering Balancing Test, 60 Hous. L. Rev. 653 (2023) available at https://houstonlawreview.org/article/73668-the-free-speech-of-public-employees-at-a-time-of-political-polarization-clarifying-the-_pickering_-balancing-test. In the instant matter, the use of the metaphor "obedient dog" would undoubtedly fall within the purview of expressive devices. As Professor Raban also notes, "it is important for courts to determine the speaker's meaning— if only because punishing an employee for a message she did not intend to convey may impact other relevant factors, like proportionality between the intended speech and the adverse employment action." Ofer Raban, The Free Speech of Public Employees at a Time of Political Polarization: Clarifying the Pickering Balancing Test, 60 Hous. L. Rev. 653 (2023).

a metaphor referring to unquestioning acquiescence to the demands of the government to comply with unconstitutional or arbitrary regulations, as well as a comment on the way in which the conductor, a government employee, who was attired in full uniform on a government train, was doing his job.  Such "disrespectful" comments are unquestionably protected speech, as demonstrated by this Court's holding in Rupp v. City of Buffalo, 91 F. 4th 623 (2024).

In Rupp, this Court reversed the District Court's determination that an attorney, who yelled "turn your lights on, asshole" at a police car,  after he and his wife along with other pedestrians avoided being hit by the vehicle, had not engaged in protected speech under the First Amendment.  Despite using an expletive (and, surely, engaging in "disrespectful" speech) and despite being unaware that he was yelling at a police officer, the Court, emphasized that speech on matters of public concern, including those concerning public health and welfare, are at the heart of First Amendment protection, as is criticism of the way in which a government employee performs his job.

As Rupp made clear and explicitly stated, the First Amendment guarantees all persons freedom to express their views. The scope of permitted expression is broad; insults that contain neither threats of coercion that intimidate nor fighting words that create the possibility of imminent violence, see Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942), must be tolerated." X-Men Security, Inc. v. Pataki, 196

F.3d 56, 68-69 (2d Cir. 1999) (internal quotation marks omitted). The First Amendment "generally prevents government from proscribing speech . . . because of disapproval of the ideas expressed." R.A.V. v. City of St. Paul, 505 U.S. 377, 382, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). "Indeed, the point of all speech protection … is to shield just those choices of content that in someone's eyes are misguided or even hurtful. … As a society, we must understand that we are strong enough to engage in the 'rough and tumble' of spirited discourse and that, indeed, we become stronger for it." Snyder v. Phelps, 562 U.S. 458 (2011). As former Supreme Court Justice Kennedy aptly noted in International Society for Krishna Consciousness v. Lee, 505 U.S. 830 (1992), "The First Amendment is often inconvenient. But that is beside the point. Inconvenience does not absolve the government of its obligation to tolerate speech."

In fact, the public policy question that Plaintiff-Appellant was speaking about – masking and mask mandates during the COVID-19 pandemic – was ubiquitous in public discourse throughout 2020 and 2021. Mask mandates affected every single American, and each of them had an opinion on the matter, including on such aspects of the subject as whether mask mandates were constitutional and whether masking was itself a political statement. The enforcement of mask mandates also pushed to the forefront of public debate the issue of whether masking was an effective public health measure, where the boundaries were, or should have been, between the

government's power in public health emergencies and individuals' rights to bodily autonomy, and whether unquestioned obedience to the government was a virtue or a vice (and whether, by extension, one's choice to mask or not constituted "virtue signaling"). Whatever one's views, it is unquestionable that this debate was joined, to some degree and in some manner, by virtually every American at that unique historical point. Indeed, few issues at that time polarized society as much as much as mask mandates, and it is precisely because this was such a divisive social issue that video of Plaintiff's exchange with the train conductor – in which he remarked to the train conductor that the face mask was "a political symbol," that the mandate was unconstitutional, that "[t]he government can't compel me to do this" and that those who refused to question the government's authority to impose such mandates were acting like "obedient dogs" – was posted to social media in the first place. These realities have been recognized by courts in this Circuit. See Balchan v. City Sch. Dist. of New Rochelle, 2023 WL 4684653, at *6 (S.D.N.Y. 2023) ("[t]he COVID-19 pandemic is unquestionably a matter of public concern); see also Light v. City of New Haven, No. 3:22-cv-425 (JAM).U.S.D.C. Dist. of Conn. 2024). Thus, Plaintiff-Appellant spoke as a private citizen, on a matter of public concern.[4]

---

[4] Plaintiff-Appellant also satisfied the second and third prongs of the prima facie showing described in Anemone, in that the facts show causation between his protected speech and the adverse action taken by defendants. Causation is not seriously at issue. To demonstrate causation, "a plaintiff must show that the protected speech was a substantial motivating factor in the adverse employment action." Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ., 444 F.3d 158, 167 (2d Cir. 2006) (internal quotations omitted). A plaintiff may establish causation either

In sum, the evidence amply demonstrates that Plaintiff-Appellant's speech was constitutionally protected.

### 3. Defendants would not have taken the same action but for Plaintiff-Appellant's Constitutionally-protected speech.

The lower court erroneously found that the defendants would have revoked Plaintiff-Appellant's promotion even in the absence of the words he spoke to the train conductor. In this regard, the court found that Mt. Healthy applied because Plaintiff-Appellant's "promotion would have been revoked even absent any desire on the Defendants' part to punish him in retaliation for his allegedly protected speech" (SPA at 15, emphasis added). As to what, precisely that "allegedly protected speech was," the District Court's answer is to be found in how it defines "other" conduct: "even if the plaintiff had not stated his views about the

---

directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action. Cobb v. Pozzi, 363 F.3d 89, 108 (2d Cir. 2004) (internal citations omitted). Proximity in time can prove causation. Cioffi, 444 F.3d at 168. There is no bright line rule in this Circuit for how close in time the adverse employment action must follow the protected speech, but "there is . . . substantial authority holding that a period between five and six months is sufficient." Anderson v. State of New York, Office of Court Admin. of Unified Court System, 614 F. Supp. 2d 404, 430 (S.D.N.Y. 2009). See also Higdon v. Jackson, 393 F.3d 1211, 1220 (11th Cir. 2004) (noting that causality can be shown through a "close temporal proximity between [the employer's] awareness [of protected conduct] and the adverse action" (internal quotation marks and alteration omitted)); Wyatt v. City of Boston, 35 F.3d 13, 16 (1st Cir. 1994) (per curiam) ("One way of showing causation is by establishing that the employer's knowledge of the protected activity was close in time to the employer's adverse action."). Here, Madeline Panzter made the decision to revoke the promotion within *eleven minutes* of watching the TikTok video.

unconstitutionality of mask mandates, the defendants would have revoked the promotion for his other conduct, namely, behaving unprofessionally, insulting a worker, and failing to follow the rules and regulations about wearing masks on public transport during a global health crisis" (SPA at 15). This was error.

In Mt. Healthy, a non-tenured teacher sued his local school board when his contract was not renewed, arguing this violated his rights under the First and Fourteenth Amendments to the Constitution on the theory that the action was based on his having telephoned a local radio station regarding the substance of a faculty dress code and appearance memo issued by the school principal. But, the plaintiff had also been involved in several incidents at the school where he taught – engaging in an altercation with another teacher and an argument with cafeteria staff, along with inappropriate behavior towards students. In determining that the telephone call was protected speech under the First Amendment, the Supreme Court found that the lower court should have determined whether the defendants had demonstrated by a preponderance of the evidence that they would have taken the same action even in the absence of the protected conduct, thus formulating the Mt. Healthy defense.

Following the decision in Mt. Healthy, this Court offered additional guidance regarding the Mt. Healthy defense. In Smith v. County of Suffolk, 776 F. 3d 114 (2015), the plaintiff, a police-officer, was alleged to have engaged in a course of misconduct, including misuse of department computers, entirely separate from the

23

First Amendment activity on the basis of which he alleged adverse action against him was taken. In vacating and remanding the District Court's determination, which included a footnote that although it need not reach the issue, defendants would "likely" succeed on the <u>Mt. Healthy</u> defense by showing that they would have taken the same actions even if Smith had not sent the media emails, this Court reasoned:

> … while the Defendants have thus presented considerable evidence of extensive misconduct that is separate and distinct from the incidents ….their arguments to us on appeal, … merely point to this unprotected conduct and summarily state that "[a]ny objective observer in view of the record evidence is bound to [conclude] ... that irrespective of [Smith's] expression of his opinion to news media and others, reasonable and adequate grounds supporting... charges for misconduct for flagrant disregard of departmental computer and Internet use rules existed." The <u>Mount Healthy</u> defense, however, demands more than this type of general conclusion, particularly on summary judgment. Much as plaintiffs are required at the prima facie stage to demonstrate not only the existence of protected speech but a causal connection between that speech and the adverse action, defendants asserting a <u>Mount Healthy</u> defense may not rely solely on the occurrence of unprotected misconduct: they must also articulate and substantiate a reasonable link between that misconduct and their specific adverse actions. A general statement that the employer would have taken some adverse action will not suffice.

> … Put simply, the evidence of record before us permits only inferences. Those inferences may be drawn in either party's favor, and we require more than inferences from an employer seeking summary judgment based on the <u>Mount Healthy</u> defense.

<u>Smith v. County of Suffolk</u>, 776 F.3d 114, 125 (2d. Cir. 2015).

Other cases in this Circuit have followed the Smith v. Suffolk County decision with respect to the Mt. Healthy defense. In Persaud v. City of New York, 2024 U.S. Dist. LEXIS 87727 (S.D.N.Y. No. 22-cv-2919 [May 14, 2014]), the Plaintiff, a New York City employee who identified himself and his agency-employer, explicitly called foreign workers "ghetto rats" in his personal Facebook post. There were four complaints to his employer, and his employer tried to fire him for engaging in "misconduct." In denying the defendant's application for summary judgment, the District Court found that the factual question of whether defendants acted based on the permissible reasons they suggested, rather than on the impermissible reason of the plaintiff's protected speech, precluded summary judgment. The evidence "reveal[ed] mixed motives," in other words, and the evidence the defendants "produce to break that tie is not exactly showstopping. They rely largely on their own statements," Persaud v. City of New York, 2024 U.S. Dist. LEXIS 87727 at 14. Thus, the "evidence of record ... permits only inferences. Those inferences may be drawn [by the jury] in either party's favor, and [the law] require[s] more than inferences from an employer seeking summary judgment based on the Mount Healthy defense." Id.

Applying these standards here, the lower court plainly erred in finding that, as a matter of law, the defendants would have revoked Plaintiff-Appellant's promotion even in the absence of his constitutionally protected speech. As discussed above,

other than the words Plaintiff-Appellant spoke, there is nothing whatsoever in the record suggesting any other reason for the revocation of the promotion. Plaintiff-Appellant here never engaged in any "conduct" that occurred in the workplace justifying the revocation of the promotion, never engaged in any "conduct" that involved his coworkers or employers and never commented on work-related policies. His performance reviews were, before and after his speech to the train conductor, uniformly positive.

Given all this, it is unsurprising that the individual defendants, in deposition, acknowledge quite forthrightly that the promotion was revoked because of the words Plaintiff-Appellant spoke. As discussed above, there is no principled reason why Plaintiff-Appellant's words can be parsed out in such a way that some of those words enjoy First Amendment protection and some do not, either on the grounds that words become "conduct" when deemed to be sufficiently "insulting," or because only some of them actually reference the U.S. Constitution, or anything else. The entirety of the argument on the train was protected First Amendment activity. Thus, the inquiry under Mt. Healthy is whether the defendants would have taken the same action but for the words Plaintiff-Appellant spoke. Clearly they would not have. Thus, the lower court's reasoning that the defendants would have revoked the promotion for Plaintiff-Appellant's "other conduct, namely, behaving unprofessionally" and "insulting a worker" fails. So much of Plaintiff-Appellant's "conduct" as consisted

in saying words as to which a finder of fact may or may not regard as "insulting" or "unprofessional" is not in fact "other conduct" for <u>Mt. Healthy</u> purposes, but rather part and parcel of the protected First Amendment activity.

The lower court also suggests the defendants would have taken the same action based on Plaintiff-Appellant's "failing to follow the rules and regulations about wearing masks on public transport during a global health crisis" (SPA at 15). It is respectfully submitted that it is entirely implausible that the promotion would have been revoked had Plaintiff-Appellant appeared in a TikTok video merely sitting on a train with his mask down to his chin, without saying anything.[5] Such a spectacle – a passenger on a commuter train in August 2021, wearing a mask during the COVID pandemic but with his mask pulled down to his chin – was a commonplace sight.[6] Whether Plaintiff-Appellant's employers would have been so appalled at his

---

[5] Plaintiff-Appellant made this point to the lower court on summary judgment. The lower court acknowledged Plaintiff-Appellant's argument, that "if he had 'remained entirely silent and motionless,' the promotion would not have been revoked;" but found that "[t]his argument does not raise a question of fact. As the plaintiff admits, he did not remain silent." (SPA: 14). Of course, this counterfactual was an attempt – albeit a futile one – meant to prompt the court to address the question of what the defendants would have done in the absence of any constitutionally-protected speech by Plaintiff-Appellant – i.e., the very inquiry required under <u>Mt. Healthy</u>.

[6] In May 2024 (after discovery was completed in this case and summary judgment was granted below), former New York State Governor Andrew Cuomo, who was still in office in August 2021, expressed astonishment and amusement at the public's gullibility and obedience during COVID, admitting in a podcast interview that he had no authority to enforce COVID restrictions. He said, "Government had no capacity to enforce any of this. You must wear a mask. People wore masks in New York. If they said I'm not wearing a mask there was nothing I could do about it. You must close your private business. I won't. There was nothing I could really do about it. It was really all voluntary. It was extraordinary when you think about it. That society acted with

appearing in a TikTok video with his mask down to his chin that they revoked his promotion strains credulity.  At the very least, it raises a factual question.  Plaintiff's description, in his affidavit, at feeling some degree of personal affront at the arbitrariness of being ordered to pull up his mask by a New Jersey Transit conductor with no regard for any context, without the conductor asking him why he had it down to his chin, and while many people, including many New Jersey Transit employees, walked around with their masks down below their chins, is doubtless a familiar feeling to many if not most Americans.  At a trial, jurors could certainly find a factual issue in the question of just how shocking the sight of Plaintiff with his mask below his chin in public truly was.  In fact, no reasonable trier of fact could reach a conclusion other than that defendants revoked Plaintiff-Appellant's promotion because of the words he spoke to the train conductor.

And, the lower court's conclusion that Plaintiff-Appellant failed to follow the

---

that uniformity voluntarily.  Because I had no enforcement capacity.  So you had a reduced trust in government."   A copy of the relevant section of this podcast is available at https://www.realclearpolitics.com/video/2024/05/09/former_gov_cuomo_government_had_no_ capacity_to_enforce_covid_mandates_it_was_really_all_voluntary.html.

This is noteworthy because, in the Plaintiff-Appellant's chain of command, then-Governor Cuomo was the next person above named defendant and WCB Commissioner Clarissa Rodriguez within the Executive Branch of the New York State government. Certainly, that the views of the person at the top of Plaintiff-Appellant's chain of command ultimately vindicated the opinions to which Plaintiff-Appellant, to his detriment, gave voice, raises factual questions for a trial, such as whether the defendants were acting on some unknown directive to punish dissenters from the various COVID rules such as masking.  At the very least, Governor Cuomo's opinions on this issue highlight that the legality and constitutionality of mask mandates, and whether they can be enforced on the public by government agents, was and continues to be a controversial public question.

rules and regulations about wearing masks on public transit during a global health crisis is a conclusion that is at best unwarranted. As Plaintiff-Appellant told the conductor, he would accept a citation which he would then fight in whatever the proper tribunal happened to be. Neither the train conductor, nor any viewers of the TikTok video, nor indeed the District Court, is able to find Plaintiff-Appellant guilty of a violation of a mask mandate or other rule of law, because he is, as he correctly pointed out, entitled to Due Process on that question. His supervisors made the decision to rescind the promotion without any inquiry into the question of whether he was issued a citation, whether he fought such a citation, or whether he did so successfully. For all they knew at the time of the adverse action, all that had happened was Plaintiff-Appellant was criticized by a government agent (the train conductor) for allegedly committing a violation which is, under New Jersey law, of a degree of seriousness akin to a jaywalking ticket.

Accordingly, the lower court erred in finding that the defendants were entitled to the <u>Mt. Healthy</u> defense. At the very least, there exist questions of fact for a jury. See <u>Pisano v. Mancone</u>, 08 Civ. 1045 (KMW) (S.D.N.Y. Mar. 21, 2011) (denying defendants' motion for summary judgment on <u>Mt</u>. <u>Healthy</u> grounds, where although they "could argue that Plaintiff's insubordination in addressing his speech outside the chain of command was particularly disruptive to Department morale, and separately justified his termination," this constituted a genuine issue of material

fact); see Morris v. Lindau, 196 F.3d 102, 110 (2d Cir. 1999), citing Piesco v. City of New York, 933 F.2d 1149, 1155 (2d Cir. 1991) (as a general rule, "[s]ummary judgment is precluded where questions regarding an employer's motive predominate in the inquiry regarding how important a role the protected speech played in the adverse employment decision.")

## POINT II

### THE LOWER COURT ERRED IN DECLINING TO APPLY THE PICKERING TEST. AND, THE EVIDENCE MAKES CLEAR THAT DEFENDANTS DID NOT HAVE A REASONABLE BELIEF THAT PLAINTIFF-APPELLANT'S SPEECH WAS LIKELY TO CAUSE WORKPLACE DISRUPTION

Petitioner-Appellant respectfully submits that the District Court was obligated to undertake an analysis of the test set forth in Pickering v. Bd. of Educ., 391 U.S. 563 (1968) and its progeny, and that its failure to do so was error. As discussed above, the first inquiry within Pickering – whether Plaintiff-Appellant spoke as a private citizen on a matter of public concern – is the same inquiry which must come first in determining whether the Mt. Healthy defense applies. Here, as also discussed above, since the lower court failed to determine whether Plaintiff-Appellant spoke as a private citizen on a matter of public concern, the court's Mt.

Healthy analysis was fatally flawed. In fact, the evidence before the court on summary judgment amply demonstrated that standard was met. Plaintiff-Appellant also respectfully submits that the lower court erred in not reaching the question whether the Pickering test was satisfied. Had it done so, it would have faced the ineluctable conclusion not only that Plaintiff-Appellant spoke as a private citizen on a matter of public concern, but also that the defendants did not take the challenged action based on a reasonable belief that his speech was likely to cause disruption in the workplace. This is at the very least a fact question; however, the evidence before presented at summary judgment – including the defendants' own actions – weighs so decisively in Plaintiff-Appellant's favor that summary judgment may be found in Plaintiff-Appellant's favor as a matter of law.

Where, as here, a government employee is suing for violation of his First Amendment rights for speech "upon a matter of public concern," the court must "arrive at a balance between the interests of the citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pappas v. Giuliani, 290 F.3d 143, 145-46 (2d Cir. 2002) (quoting Pickering, 391 U.S. at 568). Under the Pickering test, "the government can prevail if it can show that it reasonably believed that the speech would potentially interfere with or disrupt the government's activities, and can persuade the court that the potential disruptiveness

31

was sufficient to outweigh the First Amendment value of that speech." Heil v. Santoro, 147 F.3d 103, 109 (2d Cir. 1998) (citation omitted). This Court has expressly rejected the notion that the government must show actual disruption to meet its burden. See Anemone v. Metro. Transp. Auth., 629 F.3d 97, 115 (2d Cir. 2011) (a showing of potential future disruption may satisfy the Pickering test if the "employer's prediction of the disruption that such speech will cause is reasonable"); Piscottano v. Murphy, 511 F.3d 247, 271 (2d Cir. 2007) ("[e]vidence that such harms or disruptions have in fact occurred is not necessary"). Thus, the government "need only make a reasonable determination that the employee's speech creates the potential for such harms." Piscottano, 511 F.3d at 271; see also Melzer v. Bd. of Educ., 336 F.3d 185, 197 (2d Cir. 2003) ("Any actual disruption that has already occurred is of course a persuasive argument for the government that it has met its burden, but even a showing of probable future disruption may satisfy the balancing test, so long as such a prediction is reasonable"). To make this showing, the government may point to the potential impact of the speech on "maintaining efficiency, discipline, and integrity, preventing disruption of operations, and avoiding having the judgment and professionalism of the agency brought into serious disrepute." Piscottano, 511 F.3d at 271.

In assessing the government's interests in disciplining an employee for his or her speech, courts must afford "substantial weight" to the government's "reasonable

predictions of disruption." <u>Waters v. Churchill</u>, 511 U.S. 661, 673, 114 S. Ct. 1878, 128 L. Ed. 2d 686 (1994); <u>see</u> <u>also</u> <u>Piscottano</u>, 511 F.3d at 271 ("[D]eference to the government's assessment of potential harms to its operations is appropriate when the employer has conducted an objectively reasonable inquiry into the facts . . . and has arrived at a good faith conclusion as to those facts. If the employer meets this test, it may, as a matter of law, impose the discipline it deems reasonable, based on the facts it has found, without incurring liability." [citations omitted]).

Of course, summary judgment is appropriate only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[V]iewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." <u>Bay v. Times Mirror Magazines, Inc</u>., 936 F.2d 112, 116 (2d Cir. 1991) (quoting <u>Binder v. Long Island Lighting Co</u>., 933 F.2d 187, 191 [2d Cir. 1991]). To survive summary judgment on a First Amendment retaliation claim, a public employee "must bring forth evidence showing that he has engaged in protected First Amendment activity, he suffered an adverse employment action, and there was a causal connection between the protected activity and the adverse employment action." <u>Dillon v. Morano</u>, 497 F.3d 247, 251 (2d Cir. 2007).

33

Here, at the very least, Plaintiff-Appellant amply met his burden of presenting relevant and admissible evidence sufficient to create an issue of fact for a jury. The evidence suggesting that the defendants did not reasonably believe Plaintiff-Appellant's speech was likely to cause disruption in the workplace largely overlaps with the evidence tending to refute the defendants' suggestion that they would have taken the same adverse action due to factors other than that speech, as discussed in the preceding section. That the defendants did not have a reasonable belief that Plaintiff-Appellant's speech, as seen in the TikTok video, would cause disruption at the WCB, is corroborated by the fact that Plaintiff-Appellant was kept in a public facing role, conducting hearings, rather than moved to a more administrative role. He was never counseled or otherwise reprimanded for the speech which his employers purportedly considered potentially disruptive. And, Plaintiff-Appellant's performance evaluation covering the period during which his promotion was revoked and made <u>no</u> <u>mention</u> <u>whatsoever</u> of the video or the revocation. On the contrary, the evaluation stated that Plaintiff-Appellant "consistently adheres to the WCB Code of Judicial Conduct and Standards of Civility and Judge Cestaro has a professional demeanor, even when dealing with difficult parties" (A: 680). Moreover, as to the video itself, Plaintiff-Appellant never identified himself or his employer, and nothing about the video suggested any connection between that isolated incident and Plaintiff-Appellant's

34

employment or performance of his job duties in any way. There was only one single complaint made to the Plaintiff-Appellant's employer, even though there were over 50,000 Tik Tok views, which generated more than 2,000 comments while the Plaintiff's employer in <u>Persaud</u> received four complaints. That complaint was made by Marc Grodsky, who acknowledged that he personally disliked Plaintiff-Appellant. Accordingly, the evidence weighs heavily against the notion that the defendants truly believed Plaintiff-Appellant's comments to the train conductor were likely to cause disruption in the workplace. <u>See</u> <u>Davi v. Hein</u>, 2023 U.S. App. LEXIS 7087, *8, 2023 WL 2623205 (defendants not entitled to summary judgment where plaintiff, administrative law judge, made online comments critical of the welfare system, even though that was his area of practice; lower court "incorrectly applied the test because it improperly discounted the potential impact of Plaintiff's comments – that is, it did not adequately consider whether Defendants had made a showing of likely disruption or reasonably believed, in good faith, that Plaintiff's speech would cause probable future disruption. The district court did not appear to consider the possibility that Plaintiff's Facebook comments, if discovered by Project FAIR or members of the general public, would undermine OTDA's reputation by suggesting that its hearing officers were biased or unprofessional").

## **CONCLUSION**

For the foregoing reasons, Plaintiff-Appellant R. Michael Cestaro respectfully asks this Court to reverse the District Court's order granting summary judgment, and to enter an order granting summary judgment in Plaintiff-Appellant's favor or, alternatively, to remand to the District Court.

Dated:  September 12, 2024
    Brockport, NY

      Respectfully Submitted,

      _____*/S/*_____
      Richard L Sullivan, Esq.
      6558 4th Section Rd. #195
      Brockport, NY  14420

      *Attorney for Petitioner-Appellant*

## <u>CERTIFICATE OF COMPLIANCE</u>

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B)(I), and the word limit of Fed. R. App. P. 32(a)(7)(A), because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 8,881 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

# SPECIAL APPENDIX

i

## TABLE OF CONTENTS

**Page**

Opinion and Order of the Honorable Denise Cote,
    dated March 13, 2024, Appealed From ................. SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
R. MICHAEL CESTARO,                     :
                        Plaintiff,      :
                                        :          23cv593 (DLC)
              -v-                       :
                                        :          OPINION AND
CLARISSA M. RODRIGUEZ, et al.,          :          ORDER
                        Defendants.     :
                                        :
                                        :
--------------------------------------- X

APPEARANCES:

For plaintiff:
Richard Liam Sullivan
Law Office of Richard L. Sullivan
6558 4th Section Rd. #1400
Brockport, NY 14420

For defendants:
Anjali Bhat
Yuval Rubenstein
NYS Office of the Attorney General
28 Liberty St.
New York, NY 10005

DENISE COTE, District Judge:

The plaintiff, an attorney working for the New York State

Workers' Compensation Board ("WCB"), complains that his

promotion was improperly revoked for his exercise of his First

Amendment rights. For the following reasons, the defendants'

motion for summary judgment is granted.

## Background

The following facts are undisputed unless otherwise noted. Plaintiff Michael Cestaro is a Compensation Claims Referee with the WCB.  In early August of 2021, Cestaro was offered a promotion to a Senior Compensation Claims Referee/Administrative Law Judge position.  The promotion was scheduled to take effect on September 2.

On August 28, Cestaro boarded a New Jersey Transit ("NJT") train to complete a personal errand.  At the time, passengers on NJT were required, with certain exemptions, to wear masks on the train due to the COVID-19 pandemic.  While Cestaro was traveling on that train, a train conductor, who was wearing a mask and appeared to be young African American male, encountered Cestaro with his mask pulled down under his chin.  The conductor told Cestaro that he had to pull up the mask.  Cestaro responded, "I don't have to listen to you," stood up, following the conductor to the train compartment's exit, stating, "fine, I'll challenge it in court" and "it's unconstitutional, the government can't compel me to do this," and, finally, stated to the conductor "if you want to be an obedient dog, you can."  Cestaro exited the train at the next stop.  At no point did Cestaro inform the train conductor of any condition that required Cestaro to pull down his mask.

This interaction was captured on video by an unknown individual, and the video was posted on TikTok on or about August 29.  At the end of the video, a display screen on the train stating "WEAR MASKS WHILE ON BOARD" is visible.

On August 30, at 9:50 a.m., an attorney who regularly represents workers before the WCB, and who had appeared before Cestaro several times, emailed a link to the TikTok video to Madeline Pantzer, then the Chief of Adjudication at WCB.  The attorney stated to Pantzer in the email that he "just thought you should be made aware of this recent video posted of Judge Cestaro."

At 10:01 that day, Pantzer forwarded the attorney's email to WCB's ethics counsel, Cheryl Wood, defendant Heather MacMaster (then Acting General Counsel of WCB), and Pantzer's supervisor, defendant David Wertheim (then Acting Executive Director of WCB).  In the email, Pantzer stated: "I can not believe this is the new Sr. ALJ for Manhattan, it seems to me this is so unprofessional and a poor way to treat workers along with the absolute wors[t] choice on his part.  I[s] there any way to pull the promotion or do I need to wait and see during probation."

At 11:38, Wertheim responded to the email, stating, "MP -- Very very disappointing, and a clear demonstration of both

3

ignorance and arrogance. I am chewing on this and will talk to you soon." Wertheim then emailed and called Paul Connelly, the director of Human Resources at WCB, requesting guidance about how to "pull the promotion" if Pantzer decided that that was the proper course of action. Connelly emailed Wertheim, stating that Pantzer would need to "send us an email requesting we rescind the job offer, including the reason for rescinding it." Wertheim and Pantzer spoke on the telephone shortly thereafter, and at 2:29, Connelly emailed Wertheim stating that Pantzer "just called me and will be sending me an email requesting we revoke Judge Cestaro's promotion."

At 3:11, Pantzer emailed Connelly. The email states:

Michael Cestaro is a Compensation Claims Referee at the Board, he is supposed to be promoted to Senior CCR later this week, on September 2. He is in a video on the application Ti[k]Tok. He has told his supervisor that it is him in the video. This is very disturbing. In it he is not wearing a mask on a NJ transit train. When he is confronted by the conductor, a young man of color, he behaves in an unprofessional and aggressive manner. The conductor asks him to wear a mask and he refuses and says he will challenge it in court and that it is unconstitutional. He states you can't compel me to do this and finally states to the conductor that he is behaving like an obedient dog. The conductor never raises his voice and just goes on with his business. We cannot have a supervisor at the state who behaves in this manner, he cannot be trusted to be fair to the staff or the public, nor does he appear to be capable of following rules and regulations. I would like to have this pending promotion revoked. Please advise how we may go about this.

The next morning, Connelly emailed Pantzer.  Connelly
stated that "[w]e have reviewed this with Counsel's Office.  It
is okay to revoke Michael Cestaro's pending promotion.  Please
let us know when he has been notified.  Then, HR will send him
official notification."  Pantzer emailed Cestaro at 10:58 a.m.
that day informing him that his promotion had been revoked.

At 3:50 p.m. on August 31, Pantzer emailed Wood, MacMaster,
and Wertheim, stating "Just as an update: per the approval of
HR, Michael Cestaro's promotion to senior CCR has been revoked.
I have advised him."  On September 7, MacMaster, who was on
vacation between August 27 and September 7, responded to that
email, stating, "[t]his is awful," and inquiring about next
steps for filling the position.

On January 24, 2023, Cestaro sued Wertheim, Pantzer,
MacMaster, and Rodriguez pursuant to 42 U.S.C. § 1983 in their
individual and official capacities.  Cestaro's complaint alleges
that the revocation of his promotion to Senior Compensation
Claims Referee violates his right to free speech under the First
and Fourteenth Amendments to the United States Constitution and
Article I, § 8 of the New York State Constitution.  The
complaint seeks damages, including punitive damages, and
injunctive relief, specifically, enjoining defendants from
continuing to deny Cestaro any employment benefits that would

SPA-6

have accrued to him had his promotion not been revoked, requiring defendants to promote Cestaro to the position of Senior Compensation Claims Referee or a similar position, requiring defendants to purge the video and any mention of it from Cestaro's personnel file, and enjoining defendants from considering Cestaro's speech in any future personnel decision effecting him.

Defendants each answered separately but filed a joint motion for summary judgment on December 1, 2023. Defendants included a copy of the video in their exhibits in support of the motion. Discovery was extended, on consent, to December 15. The motion was fully submitted on January 26, 2024.

## Discussion

Summary judgment may be granted only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "To present a genuine issue of material fact sufficient to defeat a motion for summary judgment, the record must contain contradictory evidence such that a reasonable jury could return a verdict for the nonmoving party." Horror Inc. v. Miller, 15 F.4th 232, 241 (2d Cir. 2021) (citation omitted). Material facts are facts that "might affect the outcome of the suit under the governing law." Choi v. Tower Rsch. Cap. LLC, 2

F.4th 10, 16 (2d. Cir 2021) (citation omitted).  In considering
a motion for summary judgment, a court "construe[s] the facts in
the light most favorable to the non-moving party and must
resolve all ambiguities and draw all reasonable inferences
against the movant."  Kee v. City of New York, 12 F.4th 150, 159
(2d Cir. 2021) (citation omitted).

     Although the movant bears the initial burden of showing
that there is no genuine dispute as to a material fact, when
"the burden of proof at trial would fall on the nonmoving party,
the moving party can shift the initial burden by pointing to a
lack of evidence to go to the trier of fact on an essential
element of the nonmovant's claim."  McKinney v. City of
Middletown, 49 F.4th 730, 738 (2d Cir. 2022) (citation omitted).
If the moving party carries its burden, the nonmoving party must
"come forward with evidence that would be sufficient to support
a jury verdict in its favor."  Id. (citation omitted).  Rather
than merely "deny the moving party's allegations in a general
way," the party opposing summary judgment "must present
competent evidence that creates a genuine issue of material
fact."  Id. (citation omitted).  Unsupported allegations do not
create a material issue of fact.  Id.

I.   Eleventh Amendment Immunity

The claims against Pantzer and Wertheim in their official capacities, and those against Rodriguez and MacMaster in their individual capacities, are barred by sovereign immunity.  Any claim for relief under the New York State Constitution is also barred.

A.   Official Capacity Claims

The Eleventh Amendment to the United States Constitution bars federal courts from adjudicating claims against a state, including its agents in their official capacities, absent a state's express waiver or an act by Congress under Section 5 of the Fourteenth Amendment.  74 Pinehurst LLC v. New York, 59 F.4th 557, 570 (2d Cir. 2023).  The only exception exists for claims for prospective relief against state officials in their official capacities.  Id.  It is undisputed that neither Wertheim nor Pantzer can be sued for prospective injunctive relief in their official capacities, given that they no longer work for the WCB and thus have no authority or ability to effect such relief.

B.   Individual Capacity Claims

Personal involvement by a defendant is a prerequisite to liability in a § 1983 action.  Victory v. Pataki, 814 F.3d 47, 67 (2d Cir. 2016).  "[A] defendant in a 1983 action may not be

held liable for damages for constitutional violations merely because [s]he held a high position of authority."  Id.

There is no genuine dispute as to the lack of personal involvement in the decision to revoke plaintiff's promotion on the part of MacMaster or Rodriguez.  Cestaro admits that Rodriguez was not involved.  Although MacMaster was copied on several of the relevant emails, it is undisputed that she was on vacation during the relevant period and did not reply to the email until more than a week after the promotion was revoked. In her deposition, MacMaster denied having any role in the decision.  Cestaro's unsupported speculation to the contrary -- including his contention, without citation, that personal involvement is a "term of art" for present purposes -- does not create a genuine issue of material fact.

C.   State Law Claims

Furthermore, sovereign immunity prohibits federal courts from providing injunctive relief against state officials on the basis of state law.  See Vega v. Semple, 963 F.3d 259, 283 (2d Cir. 2020).  Thus, Cestaro's official-capacity claims based on the New York State Constitution are barred.

II.  First Amendment Retaliation

To establish a prima facie First Amendment retaliation claim, a plaintiff must show (1) that the speech or conduct at

9

issue was protected from the particular retaliatory act alleged;
(2) that the retaliatory act qualifies as an adverse action
taken against the plaintiff, and (3) that there was a causal
connection between the protected speech and the adverse action.
Heim v. Daniel, 81 F.4th 212, 221 (2d Cir. 2023).  But, even if
the plaintiff makes out a prima facie retaliation claim, a
government defendant may still receive summary judgment if it
establishes its entitlement to a relevant defense.  Id.
Defendants have done so here.[1]

    To show causation, a plaintiff must show that the protected
speech was "a substantial motivating factor in the adverse
employment action."  Id. at 222 (citation omitted).  Protected
speech could not substantially cause an adverse action if the
employer would have taken that action "in any event."  Id.
(citation omitted).  Thus, a defendant "can rebut a prima facie
showing of retaliation by demonstrating by a preponderance of
the evidence that it would have taken the same adverse
employment action even in the absence of the protected conduct."
Id. (citation omitted); see also Mt. Healthy v. Doyle, 429 U.S.
274, 285-86 (1977) ("The constitutional principle at stake is

_____

[1] The defendants rely on the defenses offered by both Pickering
v. Board of Ed. Of Tp. High School Dist. 205, Will Cnty,
Illinois, 391 U.S. 563 (1968), and Mt. Healthy v. Doyle, 429
U.S. 274, 285-86 (1977).  It is only necessary to address their
arguments under Mt. Healthy.

sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct."). This principle, articulated in Mt. Healthy, "ensures that an employee who makes an unprotected statement is not immunized from discipline by the fact that this statement is surrounded by protected statements," and "prevents an employee who engages in unprotected conduct from escaping discipline for that conduct by the fact that it was related to protected conduct." Anemone v. Metropolitan Transp. Authority, 629 F.3d 97, 115 (citation omitted).

Here, even assuming, arguendo, that the defendants improperly considered Cestaro's statement that the NJT's rule requiring masks was "unconstitutional" in deciding to revoke his promotion, they have amply demonstrated with undisputed evidence that they would have revoked it even in the absence of that statement. First, Pantzer's initial email to Wertheim, MacMaster, and Wood makes no mention of the allegedly protected speech. It focused instead on Cestaro's "unprofessional" conduct, noting that it was "a poor way to treat workers."[2]

---

[2] Cestaro's response to the defendants' Rule 56.1 statement notes that the contents of emails between Connelly and personnel from the WCB General Counsel's Office on the afternoon of August 30 have been redacted. The plaintiff did not raise this issue during discovery and therefore may not do so now.

Pantzer's August 30 email to Connelly, outlining her reasons for wishing to revoke the promotion, does mention the statement but largely focuses on plaintiff's other conduct. Pantzer explains that the video shows Cestaro not wearing a mask on public transit, and that when Cestaro "is confronted by the conductor, a young man of color, he behaves in an unprofessional and aggressive manner." She further states that "[w]e cannot have a supervisor at the state who behaves in this manner, he cannot be trusted to be fair to the staff or the public, nor does he appear to be capable of following rules and regulations." Although Pantzer notes, by way of narration, that "[t]he conductor asks him to wear a mask and he refuses and says he will challenge it in court and that it is unconstitutional," the rationale focuses on his failure to wear a mask and his behavior towards the conductor -- including "stat[ing] to the conductor that he is behaving like an obedient dog."

Connelly's emails stated that the issue was that "[w]e have a judge who was filmed giving a transit authority employee a very hard time about wearing a mask on the train" and noted that "[t]he video was posted on tiktok and one of the outside attorneys shared the video" with Pantzer. Connelly noted in an email to Wertheim that "[o]bviously, at least one person from outside the Board connected him to the Board."

12

Thus, Wertheim and Pantzer both voiced concerns that Cestaro's conduct, as captured by the video, cast doubt on his ability to treat workers fairly and with respect.  It is undisputed that the role of Senior Compensation Claims Referee requires, <u>inter alia</u>, adjudicating workers' compensation claims, including presiding over cases and conducting hearings if necessary.  Cestaro's inability to treat those appearing before him respectfully, or the appearance of such inability, would be a sufficient reason to revoke the promotion.

Pantzer also expressed concern that Cestaro did not appear able to follow rules and regulations.  It is undisputed that a Senior Compensation Claims Referee must "ensur[e] that hearing and conciliation meetings are conducted in compliance with established professional standards, law, and procedures."

Cestaro has failed to raise a question of fact regarding the defendants' evidence that they would have revoked his promotion even in the absence of any protected speech.  He first contends that he argued with the conductor because he "felt" the conductor was being rude.  Whatever the plaintiff's motivation may have been, the defendants were entitled to make their assessment about the plaintiff's suitability for the Senior Compensation Claims Referee role based on his conduct depicted in the TikTok video and their knowledge of the requirements for

that role.  In any event, no reasonable juror viewing the video would find that the conductor acted either rudely or inappropriately.

Cestaro next argues that his protected speech must have caused the defendants to revoke his promotion because if he had "remained entirely silent and motionless," the promotion would not have been revoked.  This argument does not raise a question of fact.  As the plaintiff admits, he did not remain silent. Instead, he argued with the conductor, and the defendants were entitled to find that the plaintiff's manner in doing so disqualified him from receiving the promotion.

Plaintiff's interactions with the conductor included his use of the expression "obedient dog."  Plaintiff points out that he used the conditional tense when addressing the conductor as an obedient dog, and argues that, even if it was an inappropriate thing to say, it should be considered a metaphor and protected speech.  Cestaro's attempt to excuse his use of this phrase fails.  His interaction with the conductor, including this parting statement by the plaintiff, was disrespectful.  Under Mt. Healthy, evidence of the disruptive impact of potentially protected speech may provide a "further permissible and non-retaliatory" reason to act.  Anemone, 629 F.3d at 120.

Finally, Cestaro suggests that he was in fact following the rules because the rules provided for medical exemptions.  He explains that his impaired vision requires him to lower his mask to read and would qualify him for such an exemption.  It is undisputed, however, that he did not mention his impaired vision to the conductor and never requested an exemption from the NJT, the MTA, or the WCB.  Cestaro testified that he wore a mask in WCB offices in compliance with the WCB's requirement and did not ask anyone at WCB to be excused from wearing a mask; he also wore a mask while traveling on the subway in New York and did not ask the MTA that he be excused from wearing a mask.

Thus, the undisputed evidence shows even if the plaintiff had not stated his views about the unconstitutionality of mask mandates, the defendants would have revoked the promotion for his other conduct, namely, behaving unprofessionally, insulting a worker, and failing to follow the rules and regulations about wearing masks on public transit during a global health crisis.  Given the undisputed evidence of Cestaro's behavior, "any reasonable jury would find that [Cestaro's promotion would have been revoked] even absent any desire on the Defendants' part to punish him in retaliation for his allegedly protected speech."  Id. at 117.  The defendants are thus entitled to summary judgment on the plaintiff's claims.

15

SPA-16

### Conclusion

Defendants' December 1, 2023 motion for summary judgment is granted.

Dated:    New York, New York
          March 13, 2024

                              _____
                                  DENISE COTE
                         United States District Judge