# 24-973

## United States Court of Appeals for the Second Circuit

R. MICHAEL CESTARO,

*Plaintiff-Appellant,*

v.

CLARISSA M. RODRIGUEZ, Chair, New York State Workers' Compensation Board, in her individual and official capacity, DAVID WERTHEIM, Former Acting Executive director and Former General Counsel, New York State Workers' Compensation Board, in his individual and official capacity, HEATHER MACMASTER, Acting General Counsel, New York State Workers' Compensation Board, in her individual and Official Capacity, MADELINE H. PANTZER, Former Project Director and Chief of Adjudication, New York State Workers' Compensation Board, in her individual and official capacity,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Southern District of New York

## BRIEF FOR APPELLEES

BARBARA D. UNDERWOOD
 *Solicitor General*
JUDITH N. VALE
 *Deputy Solicitor General*
ANAGHA SUNDARARAJAN
 *Assistant Solicitor General*
 *of Counsel*

LETITIA JAMES
 *Attorney General*
 *State of New York*
Attorney for Appellees
28 Liberty Street
New York, New York 10005
(212) 416-8073

Dated: December 12, 2024

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES.....................................................iii

PRELIMINARY STATEMENT.............................................. 1

ISSUES PRESENTED .................................................... 3

STATEMENT OF THE CASE .............................................. 3

    A.   Factual Background.............................................. 3

        1.   Cestaro is selected for a promotion. .................. 3

        2.   Cestaro berates a conductor on a New Jersey Transit train. .............................................. 5

        3.   Cestaro's promotion is revoked. ...................... 8

    B.   This Litigation ............................................... 12

    C.   The Decision Below .......................................... 13

STANDARD OF REVIEW AND SUMMARY OF THE ARGUMENT....................................................... 15

ARGUMENT ............................................................ 18

POINT I

THE SUMMARY JUDGMENT RECORD ESTABLISHED THAT DEFENDANTS WOULD HAVE REVOKED THE PROMOTION ABSENT CESTARO'S PURPORTED PROTECTED SPEECH ....................... 18

    A.   Defendants Would Have Revoked the Promotion Because of Cestaro's Unprofessional and Demeaning Conduct Toward a Worker.................................... 21

i

B.   Defendants Would Have Revoked the Promotion Based
     on Cestaro's Refusal to Comply with New Jersey Transit
     Rules. ......................................................................................... 26

C.   Defendants Would Have Revoked the Promotion
     Because of the Reputational Risk to the WCB Caused by
     the Video of Cestaro's Conduct. .............................................. 28

POINT II

     DEFENDANTS ARE ALSO ENTITLED TO SUMMARY JUDGMENT
     UNDER THE *PICKERING* BALANCING TEST ............................................. 31

POINT III

     DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FROM THE
     PERSONAL CAPACITY CLAIMS. ................................................................ 35

CONCLUSION ........................................................................................ 37

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Anemone v. Metropolitan Transp. Auth.*,
    629 F.3d 97 (2d Cir. 2011) ................................... 19-20, 23, 25, 28, 36

*Ashcroft v. al-Kidd*,
    563 U.S. 731 (2011) ................................................................ 36

*Barzilay v. City of New York*,
    610 F. Supp. 3d 544 (S.D.N.Y. 2022) ................................. 25

*Cioffi v. Averill Park Cent. Sch. Dist. Board of Educ.*,
    444 F.3d 158 (2d Cir. 2006) ............................................... 18

*Connick v. Myers*,
    461 U.S. 138 (1983) ....................................................... 32, 34

*Curran v. Cousins*,
    509 F.3d 36 (1st Cir. 2007) ............................................... 32

*Danahy v. Buscaglia*,
    134 F.3d 1185 (2d Cir. 1998) ............................................ 35

*Davi v. Hein*,
    No. 21-719, 2023 WL 2623205 (2d Cir. Mar. 24, 2023) ..................... 33

*Faghri v. University of Conn.*,
    621 F.3d 92 (2d Cir. 2010) ........................................... 33, 35

*Giacalone v. Abrams*,
    850 F.2d 79 (2d Cir. 1988) ............................................... 37

*Greenwich Citizens Comm., Inc. v. Counties of Warren and
    Washington Indus. Dev. Agency*,
    77 F.3d 26 (2d Cir. 1996) ........................................... 23, 36

*Heil v. Santoro*,
    147 F.3d 103 (2d Cir. 1998) ............................................. 19

iii

**Cases**                                                                     **Page(s)**

*Lewis v. Cowen,*
    165 F.3d 154 (2d Cir. 1999) ................................................................ 36

*Locurto v. Giuliani,*
    447 F.3d 159 (2d Cir. 2006) ................................................................ 20

*MacRae v. Mattos,*
    106 F.4th 122 (1st Cir. 2024) .............................................................. 24

*McEvoy v. Spencer,*
    124 F.3d 92 (2d Cir. 1997) .................................................................. 35

*Melzer v. Board of Educ. of City Sch. Dist. of City of New York,*
    336 F.3d 185 (2d Cir. 2003) ................................................................ 32

*Mount Healthy City School District Board of Education v. Doyle,*
    429 U.S. 274 (1977) ................................................................ 1, 18-19

*Pappas v. Giuliani,*
    290 F.3d 143 (2d Cir. 2002) ................................................................ 33

*Pickering v. Board of Education of Township High School, District 205,*
    391 U.S. 563 (1968) ................................................ 2, 14, 17, 31-32

*Sheppard v. Beerman,*
    317 F.3d 351 (2d Cir. 2003) ................................................................ 32

*Smith v. County of Suffolk,*
    776 F.3d 114 (2d Cir. 2015) ................................................................ 15

*Tolbert v. Smith,*
    790 F.3d 427 (2d Cir. 2015) ................................................................ 31

*Waters v. Churchill,*
    511 U.S. 661 (1994) .................................................................... 19, 25

## PRELIMINARY STATEMENT

In August 2021, plaintiff-appellant R. Michael Cestaro, an administrative law judge (ALJ) employed by the New York State Workers' Compensation Board (WCB) was offered a promotion to a supervisory position. Shortly before Cestaro was scheduled to start as a supervisor, a video was posted on TikTok, a social media platform, showing Cestaro unprofessionally berating a New Jersey Transit (NJT) conductor who had asked Cestaro to follow the NJT's then-applicable rules requiring face masks to protect against COVID-19. The video was seen thousands of times, including by members of the workers' compensation community. Cestaro's promotion was subsequently revoked. Cestaro then sued, alleging that the promotion was revoked as retaliation for his speech in violation of the First Amendment.

The district court (Cote, J.) granted summary judgment to defendants, and this Court should affirm. The district court correctly concluded that defendants are entitled to the defense set forth in *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), because defendants would have revoked the promotion even in the absence of Cestaro's purportedly protected speech. As the court correctly determined,

any reasonable juror would find that the decision to revoke Cestaro's promotion was substantially motivated by Cestaro's unprofessional behavior toward the conductor, failure to comply with NJT's generally applicable rules, and the reputational harm to WCB from the broad dissemination of the video. Each of these reasons called into question Cestaro's suitability for a supervisory position, regardless of the content of Cestaro's statements to the conductor.

Alternatively, this Court can affirm by applying the balancing test set forth in *Pickering v. Board of Education of Township High School, District 205*, 391 U.S. 563 (1968). The undisputed record establishes that defendants reasonably concluded that Cestaro's behavior was likely to disrupt the WCB's adjudicative process by undermining public trust in that process. Indeed, the video showing Cestaro's unprofessional conduct was disseminated widely among members of the workers' compensation community, several of whom responded with shock and outrage, just days before Cestaro was scheduled to become a supervisor with management responsibilities. The WCB's interest in protecting the public's trust in its adjudication processes outweighs Cestaro's interest as a private citizen in speaking about his views on the NJT's mask mandate.

2

## ISSUES PRESENTED

1. Whether the district court correctly granted summary judgment to defendants where the undisputed record establishes that defendants would have revoked Cestaro's promotion for non-retaliatory reasons, regardless of whether he engaged in protected speech.

2. Alternatively, whether defendants are entitled to summary judgment under the *Pickering* balancing test because the risk of disruption to the WCB's adjudicative processes from Cestaro's conduct outweighed his interest in expressing opposition to NJT's mask requirements.

3. Whether defendants are entitled to qualified immunity from Cestaro's personal capacity claims in any event.

## STATEMENT OF THE CASE

### A. Factual Background

### 1. Cestaro is selected for a promotion.

Plaintiff-appellant R. Michael Cestaro is currently employed by the WCB as a Compensation Claims Referee. In that position, he is an ALJ responsible for adjudicating benefits claims under New York's workers' compensation system. (Appendix (A.) 152-155, 742.)

3

ALJs employed by the WCB are generally assigned to adjudicate claims in a particular geographic region under the supervision of a Senior Compensation Claims Referee. (A. 152-155, 615.) In addition to adjudicating claims, Senior Compensation Claims Referees are responsible for training and evaluating ALJs, assigning cases, and ensuring that hearings are conducted in compliance with the workers' compensation law's public interest goals. (A. 128, 155.) Senior Compensation Claims Referees are also responsible for "setting the tone" of their office and ensuring that all WCB employees under their supervision treat individuals who appear before the WCB with respect and civility. (A. 128, 155.) Senior Compensation Claims Referees also liaise with attorneys, insurance carriers, union representatives, employers, and others interested in the WCB's work, and are responsible for advising "on the rules, regulations, and policies of the Board." (A. 155.)

During the summer of 2021, the WCB posted an opening for a Senior Compensation Claims Referee to supervise ALJs in Manhattan. Cestaro applied for that position. Defendants Madeline Pantzer and Heather MacMaster interviewed Cestaro for the Senior Compensation Claims Referee position, and separately interviewed another candidate

4

as well. (A. 132.) At the time, Pantzer was WCB's Chief of Adjudication and was responsible for supervising Senior Compensation Claims Referees and for ensuring that the WCB's adjudicative processes were fair and orderly. (*See* A. 126, 614.) Pantzer stepped down from that position in January 2022, and has since retired. (A. 126.) MacMaster was Acting General Counsel during the time period relevant here; she has since become the WCB's General Counsel. (A. 122, 461-462.)

Following his interview, Cestaro was offered a promotion to the Senior Compensation Claims Referee position. (*See* A. 132.) The senior position came with a pay increase. (*See* A. 22.) Cestaro accepted the position and was scheduled to start as a Senior Compensation Claims Referee on September 2, 2021. (*See* A. 21.)

## 2. Cestaro berates a conductor on a New Jersey Transit train.

On August 28, 2021, the weekend before Cestaro was scheduled to start as a Senior Compensation Claims Referee, Cestaro boarded a NJT train to Lyndhurst, New Jersey to run a personal errand. (A. 189-190.)

At the time, all passengers were required to wear a face mask over their nose and mouth while on board a NJT train to protect against the

5

spread of COVID-19, subject to certain narrow exemptions. (*See* A. 164, 174, 703.) Passengers were informed of this requirement on their NJT tickets and through signs posted inside the train cars. (A. 740; *see* Video dated Aug. 28, 2021, filed as Ex. A to the Rubinstein Decl.[1]) During his train trip, Cestaro pulled his face mask down under his chin, leaving his mouth and nose uncovered. (*See* Video.)

A NJT conductor approached Cestaro and asked him to pull his mask up over his nose and mouth. (Video.) Cestaro responded to the conductor by saying "I don't have to listen to you." Cestaro then stood up and followed the conductor to the train car's exit, saying: "fine, I'll challenge it in court," and "it's unconstitutional, the government can't compel me to do this." Cestaro told the conductor that "if you want to be an obedient dog, you can," and exited the train. (Video; *see* A. 735-736.) Although Cestaro later testified in his deposition that he suffers from a visual impairment that required him to pull down his mask to access his electronic

---

[1] A copy of the 23-second video documenting Cestaro's interaction with the NJT conductor was filed with the district court on CD-Rom in connection with defendants' motion for summary judgment and is part of the record on appeal. (*See* A. 11, 161; *see also* Certificate of Service, 2d Cir. ECF No. 33 (video filed with the appendix in this Court on CD-Rom).)

train ticket (A. 193), at no point during his interaction with the conductor did Cestaro inform the conductor of his purported visual impairment, seek an exemption from the NJT's face-covering rule, or provide any explanation for why he pulled down his mask. (*See* Video; A. 194, 199-200.)

Another passenger captured Cestaro's interaction with the conductor on video and posted that video to TikTok, a social media platform. (*See* A. 201-202, 207.) There is no dispute that Cestaro is the passenger captured in the video. (*See* A. 148.) On August 29, 2021, the day after the incident, another ALJ called Cestaro to tell him that the video had been circulating online and that "people had seen it and contacted her." (A. 201-203.) Cestaro then downloaded a 23-second version of the video.[2] (A. 208; *see* A. 202-206.) Over the next several days, the video was seen by thousands of people, including other ALJs, members of the workers' compensation

---

[2] The parties agree that at least one version of the video posted to TikTok was longer than the twenty-three second version that is part of the record here. (A. 282, 399, 748.) However, there is no evidence that, in making the revocation decision, defendants focused on any part of Cestaro's interaction that is not adequately depicted in the twenty-three second version of the video. Defendants do not have a copy of the longer version of the video, and that version is no longer available on TikTok.

7

bar, and state insurance fund representatives. (A. 202-203, 210, 212-213, 220-221.)

### 3. Cestaro's promotion is revoked.

The day after the video was posted to TikTok, Daniel Elias, an attorney who regularly practices before the WCB, emailed a link to the video to Pantzer, stating that she should be "made aware of this recent video posted of Judge Cestaro." (A. 138.) Elias heard of the video from another attorney who works at his law firm and practices in front of the WCB, who in turn heard of the video from several other people, including a representative of the state insurance fund. (A. 539-540.) Elias testified during his deposition that he found Cestaro's behavior to be a serious breach of civility and that the video undermined his confidence in Cestaro's ability to be fair to workers appearing at WCB hearings. (A. 225.) Elias explained that he was particularly troubled by Cestaro's decision to call the conductor an "obedient dog" because the conductor appeared in the video to be African American and because Elias understood the phrase "obedient dog" to be racially charged. (A. 226-228.) Elias testified that he sent the video to Pantzer because he believed that the video was likely to "reflect very poorly" on the WCB. (A. 224.)

8

Pantzer watched the video shortly after receiving Elias's email. Cestaro's conduct in the video caused her to "re-evaluate whether he was an appropriate candidate for a Senior Compensation Claims Referee position." (A. 128.) Specifically, Pantzer was troubled by Cestaro's failure to treat the conductor with civility and respect (*see* A. 128, 282), and by his decision to respond to the conductor's request to follow NJT's masking rule in a rude, aggressive, and demeaning manner (*see* A. 293-294). Like Elias, Pantzer testified that she understood the phrase "obedient dog" to be racially charged. (*Id.*)

Pantzer then forwarded Elias's email to MacMaster, defendant David Wertheim, and a third WCB employee. (A. 137.) Wertheim was the WCB's General Counsel and Acting Executive Director; he has since left the WCB. (A. 118.) In her email, Pantzer noted that she "can not believe this is the new Sr. ALJ for Manhattan," and that Cestaro's conduct was "so unprofessional and a poor way to treat workers along with the absolute worst choice on his part." (A. 137.) Pantzer then asked if it was possible to revoke Cestaro's promotion to the Senior Compensation Claims Referee position. (A. 137.)

Wertheim responded to Pantzer after watching the video, stating that he found Cestaro's behavior "[v]ery very disappointing and a clear demonstration of both ignorance and arrogance." (A. 137.) Wertheim later explained that he was troubled by Cestaro's failure to comply with NJT's mask requirement and decision to "berat[e] and mistreat[] verbally" a public employee who had asked Cestaro to comply with that requirement. (A. 401; *see* A. 402-403.) Wertheim was also concerned that Cestaro's conduct—"berating a public employee and not following a mask-wearing directive"—could cause reputational harm to the WCB, especially because the agency had received the video from a workers' compensation claimant's attorney. (A. 411.)

Wertheim ultimately concluded that the promotion should be revoked. He contacted WCB's Director of Human Resources, Paul Connelly, to discuss that decision. (A. 120, 149.) Following an internal discussion with WCB's General Counsel's Office (*see* A. 143-144, 146-150), Connelly asked Wertheim and Pantzer to "send us an email requesting we rescind the job offer, including the reasons for rescinding it." (A. 120.) Pantzer responded with an email to Connelly summarizing the contents of the video and explaining that she would like to have the promotion revoked

10

because Cestaro "behaves in an unprofessional and aggressive manner" toward an NJT conductor. (A. 135.) Pantzer explains that the WCB "cannot have a supervisor . . . who behaves in this manner, he cannot be trusted to be fair to the staff or the public, nor does he appear to be capable of following rules and regulations." (A. 135.) After Connelly confirmed that it was "ok to revoke" the pending promotion (A. 135), Pantzer notified Cestaro by email that the promotion had been revoked on August 31, 2021. (A. 140.)

During this time, MacMaster was out of the office on vacation. (A. 123.) Although MacMaster was copied on several emails discussing the revocation decision, MacMaster did not respond to any of those emails until she returned from vacation on September 7, 2021, after the revocation decision had already been made. (*See* A. 725.) There is no evidence that MacMaster participated in any discussion regarding the revocation decision while she was on vacation. (A. 123.)

## B.  This Litigation

In January 2023, Cestaro filed this lawsuit in the U.S. District Court for the Southern District of New York against Pantzer, Wertheim, MacMaster, and defendant Clarissa Rodriguez, the Chair of the WCB, in their individual and official capacities. Cestaro alleged that the decision to revoke the promotion had been unconstitutional retaliation for Cestaro's speech, in violation of the First Amendment. (*See* A. 15-26.) Cestaro sought damages and an order requiring defendants to reinstate him to the Senior Compensation Claims Referee position. (A. 25.)

Following discovery, Cestaro withdrew his personal capacity claim against Rodriguez, acknowledging that she has no day-to-day involvement in the WCB's personnel decisions and thus was not personally involved in the revocation decision. (A. 783 n.13; *see also* A. 116.) Cestaro also withdrew his official capacity claims against Wertheim and Pantzer because they had each left the WCB and no longer had any control over the WCB's personnel decisions. (A. 783 n.13; *see also* A. 118 (Wertheim), 126 (Pantzer).)

12

## C.    The Decision Below

Defendants moved for summary judgment on all remaining claims. The district court (Cote, J.) granted summary judgment to defendants, concluding that no reasonable jury could conclude that the decision to revoke the promotion was substantially motivated by Cestaro's purportedly protected speech rather than by non-retaliatory reasons, i.e., his unprofessional behavior towards a worker and failure to follow generally applicable rules and regulations.

In reaching its decision, the district court assumed without deciding that Cestaro had engaged in at least some protected speech. The court then concluded that defendants were entitled to summary judgment under the undisputed record, which made clear that defendants would have revoked the promotion even in the absence of such protected speech. (Special Appendix (S.P.A.) 11, 15.) As the district court explained, the discussions between Pantzer, Wertheim, and others at the WCB all focused on Cestaro's unprofessional and demeaning behavior toward the conductor, which raised concerns about Cestaro's ability to treat workers appearing before the WCB with respect. (S.P.A. 13.) The court further explained that Cestaro's refusal to follow rules and regulations reasonably

13

raised concerns about his ability to effectively supervise ALJs and ensure that hearings and conciliation meetings are conducted in compliance with the WCB's professional standards, law, and procedures.

The district court also granted summary judgment to MacMaster on the personal capacity claims, holding that no reasonable factfinder could conclude that she was personally involved in the revocation decision. (S.P.A. 9.) Cestaro does not challenge this portion of the district court's decision in his opening brief and has thus waived this argument.

Because the district court had ruled in defendants favor, it did not decide whether defendants were entitled to summary judgment under the *Pickering* balancing test (S.P.A. 10 n.1), which requires the court to weigh the employee's interest in speaking on a matter of public concern against the employer's interest in preventing workplace disruption. *See* 391 U.S. at 568. The district court also did not decide whether defendants were entitled to qualified immunity.

**STANDARD OF REVIEW AND SUMMARY OF THE ARGUMENT**

This Court reviews the district court's grant of summary judgment de novo. *Smith v. County of Suffolk*, 776 F.3d 114, 121 (2d Cir. 2015). In doing so, this Court considers whether the record, taken as a whole, contains sufficient contradictory evidence such that a reasonable jury could return a verdict for the nonmoving party. *See, e.g.*, *id*.

I.   The district court properly granted summary judgment to defendants under *Mount Healthy* because, as the undisputed record establishes, defendants would have revoked the promotion even if Cestaro had not expressed his views about NJT's mask requirements.

A. Any reasonable juror would conclude that, even if Cestaro had not engaged in protected speech, defendants would have revoked the promotion because Cestaro engaged in unprofessional, aggressive, and demeaning behavior toward a public worker who was doing his job. As Wertheim and Pantzer both explained, Cestaro's decision to berate the conductor was contrary to the WCB's expectations for its employees' conduct. Cestaro's conduct undermined his ability as a supervisor to effectively enforce the WCB's professional standards and interact with the WCB's many constituents. Moreover, there is no evidence that Wertheim

15

or Pantzer expressed disapproval toward Cestaro's stated views on NJT's masking requirement.

B. The revocation decision was also motivated by Cestaro's failure to comply with NJT's mask requirements, and this failure provides an additional, non-retaliatory reason for the decision. Both Wertheim and Pantzer explained that Cestaro's failure to comply with NJT's rules raised questions about his fitness for a supervisory position.

C. Regardless of any protected speech, defendants would have revoked the promotion for an additional, independent reason: the broad dissemination of the video documenting Cestaro's unprofessional behavior was likely to hurt the WCB's reputation. It is undisputed that members of the workers' compensation community were outraged by the video. Defendants reasonably concluded based on this reaction that Cestaro's behavior was likely to harm the WCB's credibility among its key constituents, and that revoking the promotion was thus warranted.

II. The Court may affirm on the alternative, independent ground that defendants are entitled to summary judgment under the *Pickering* balancing test. That test weighs a public employee's interest in engaging in protected speech as a private citizen with the public employer's interest

16

in preventing disruption in the workplace and promoting the efficiency of the public services it performs. *See* 391 U.S. at 568.

Here, the WCB's interest in avoiding the public mistrust and disruption that was likely to result from Cestaro's conduct outweighed Cestaro's interest in publicly opposing NJT's mask requirements. As the summary judgment record establishes, the video caused an uproar among members of the workers' compensation community days before Cestaro was scheduled to start a supervisory position. Accordingly, defendants reasonably predicted that Cestaro's conduct risked undermining the public's trust that the WCB is a fair and even-handed adjudicator. This prediction was further supported by the fact that Cestaro was scheduled to assume a supervisory position that involved managing other ALJs and communicating publicly with the WCB's various constituencies within days of the video's dissemination.

III.  This Court can affirm the grant of summary judgment on Cestaro's personal capacity claims for the independent reason that defendants are entitled to qualified immunity. In light of this Court's precedent, reasonable officers in defendants' position would not have believed that

responding to Cestaro's unprofessional conduct by revoking his promotion would run afoul of the First Amendment.

## ARGUMENT

### POINT I

#### THE SUMMARY JUDGMENT RECORD ESTABLISHED THAT DEFENDANTS WOULD HAVE REVOKED THE PROMOTION ABSENT CESTARO'S PURPORTED PROTECTED SPEECH

Applying the established framework set forth in *Mount Healthy*, the district court correctly determined that defendants would have revoked Cestaro's promotion for non-retaliatory reasons, regardless of any protected speech he uttered during his exchange with the conductor. *See* 429 U.S. at 287. The decision below should be affirmed on this basis.

A public employee alleging First Amendment retaliation bears the initial burden of showing that (i) the speech at issue addressed a matter of public concern; (ii) the employee suffered an adverse employment decision; and (iii) a causal connection exists between the speech and that adverse employment action, such that it could be inferred that the speech was a "substantial motivating factor" in the adverse employment decision. *Cioffi v. Averill Park Cent. Sch. Dist. Board of Educ.*, 444 F.3d 158, 162, 167 (2d Cir. 2006). Where a plaintiff makes that prima facie showing, an

employer is entitled to summary judgment if it establishes that a relevant defense applies. *See Anemone v. Metropolitan Transp. Auth.*, 629 F.3d 97, 114 (2d Cir. 2011).

The Supreme Court's decision in *Mount Healthy* provides one such defense, specifically, that the employer would have taken the same adverse employment action "even in the absence of the protected conduct." 429 U.S. at 287; *see Anemone*, 629 F.3d at 114. If established, the *Mount Healthy* defense rebuts the plaintiff's prima facie showing of causation. As the Court has explained, if the employer would have made the same decision even in the absence of any protected speech, that protected speech could not have substantially motivated the adverse employment decision. *See, e.g.*, *Waters v. Churchill*, 511 U.S. 661, 681 (1994); *Heil v. Santoro*, 147 F.3d 103, 110 (2d Cir. 1998).

The district court correctly applied these standards in concluding that defendants were entitled to summary judgment. As an initial matter, the district court was not required to decide which portions of Cestaro's statements were protected speech before applying *Mount Healthy*. *Contra* Brief for Appellant (Br.) at 13-16. To the contrary, courts routinely assume that at least portions of a plaintiff's statements are

19

protected speech (or that other elements of the required prima facie show-
ing have been made) and then determine whether a defense to liability
has been established in any event. *See, e.g.*, *Anemone*, 629 F.3d at 117
(assuming certain statements were protected and granting summary
judgment under *Mount Healthy*); *Locurto v. Giuliani*, 447 F.3d 159, 175
(2d Cir. 2006) (same under *Pickering*).

The district court properly followed that course here in assuming
that at least some of Cestaro's statements to the conductor were protected
speech and proceeding to evaluate the application of the *Mount Healthy*
defense. And the court correctly determined that *Mount Healthy* applies
because Wertheim and Pantzer would have revoked the promotion based
on Cestaro's unprofessional conduct, refusal to comply with NJT's mask
requirements, and the reputational risks to the WCB from that conduct—
even if he had not engaged in any protected speech.

**A.   Defendants Would Have Revoked the Promotion Because of Cestaro's Unprofessional and Demeaning Conduct Toward a Worker.**

As the district court properly determined, the undisputed record established that defendants would have revoked Cestaro's promotion because he engaged in unprofessional, aggressive, and demeaning behavior toward a public worker, regardless of Cestaro's stated views about NJT's mask requirement. The *Mount Healthy* defense applies on this basis alone.

The summary judgment record established that Wertheim and Pantzer would have revoked the promotion based on the unprofessional nature of Cestaro's conduct towards the conductor, even if Cestaro had not engaged in any protected speech. For example, in her emails to Wertheim and others at the WCB immediately after watching the video, Pantzer focused on Cestaro's unprofessional behavior toward the conductor, noting that it was demeaning, offensive, and "a poor way to treat workers." (A. 137, 293-294.) Like Pantzer, Wertheim's contemporaneous response to the video focused on Cestaro's tone and behavior when discussing the video, explaining that all WCB employees are expected to treat workers with respect and that berating a public employee trying to do his job was contrary to that expectation. (*See* A. 119, 400-403.)

21

These reactions are consistent with Pantzer and Wertheim's subsequent testimony. Pantzer explained during her deposition that Cestaro's aggressive response to the conductor—which included Cestaro getting up from his seat and following the conductor while continuing to yell (*see* Video)—ran contrary to the WCB's expectation that all its employees treat workers with respect and civility (A. 282; *see also* A. 128). Moreover, as Pantzer explained, supervisors are expected to "set[] the tone" for the employees whom they supervise and to ensure that those employees comply with WCB's professional standards. (A. 128; *see also* A. 282, 294, 304.) Similarly, Wertheim emphasized that Cestaro's behavior was particularly problematic because Senior Compensation Claims Referees are responsible for "supervising and guiding" ALJs to ensure that they conduct hearings in a manner consistent with the WCB's professional standards. (A. 119.)

Cestaro misses the mark by asserting that the content of his statements could not reasonably be separated from his unprofessional and demeaning behavior. *See* Br. at 26-27. However, this Court has consistently applied the *Mount Healthy* framework in cases like this, where the adverse decision followed from a single incident that involves both

22

unprotected conduct and allegedly protected speech. *See, e.g., Greenwich Citizens Comm., Inc. v. Counties of Warren and Washington Indus. Dev. Agency*, 77 F.3d 26, 33 (2d Cir. 1996). As in other cases applying *Mount Healthy*, the focus of the analysis in these cases is whether the adverse action was substantially motivated by the non-retaliatory reason provided by the employer and therefore whether the employer would have reached the same decision even in the absence of protected speech. *Id.*; *see also Anemone*, 629 F.3d at 119-20.

Here, Cestaro failed to provide evidence to support any reasonable inference that Wertheim and Pantzer were substantially motived by retaliatory intent rather than by responding to Cestaro's unprofessional conduct. In discussing the video, Pantzer and Wertheim focused on Cestaro's treatment of the conductor, not his expressed opposition to NJT's masking requirements. Indeed, Pantzer's initial email conversation with Wertheim does not reference the content of Cestaro's speech. (*See* A. 137.) Though Pantzer's subsequent email outlining the reasons for the revocation decision generally summarizes the contents of the video, including Cestaro's statements, that email too focuses on Cestaro's unprofessional and aggressive behavior. (*See* A. 135 ("[w]e cannot have a

23

supervisor at the state who behaves in this manner").) And this email does not express any disapproval of Cestaro's stated views on NJT's masking requirements. *See MacRae v. Mattos*, 106 F.4th 122, 140 (1st Cir. 2024) (lack of evidence of "any personal dislike or disapproval" of speech by the employer undermines inference of retaliatory intent), *pet. for cert. docketed*, No. 24-355 (Sept. 26, 2024).

Contrary to Cestaro's contention (Br. at 20-22, 25-26), Pantzer's discussion of Cestaro's decision to call the conductor "an obedient dog" does not alter the result. It is undisputed that Pantzer, Elias, and other members of the workers' compensation bar found Cestaro's use of that phrase demeaning and understood that phrase as carrying racial connotations when directed at the conductor, who appeared to be African American. (A. 293-294, 548-549.) And it is undisputed that Pantzer reasonably concluded that such demeaning behavior toward a worker undermined Cestaro's suitability for a supervisory position. (*See, e.g.*, A. 128, 282.) Cestaro asserts that he intended this phrase to express disapproval of NJT's mask requirement (*see* Br. at 18-21). But as this Court and others have made clear, public employers are entitled to discipline an employee for behaving in a rude, disruptive, or unprofessional manner, even if the

24

employee addresses a matter of public concern while doing so. *See, e.g.*, *Anemone*, 629 F.3d at 119-20; *Barzilay v. City of New York*, 610 F. Supp. 3d 544, 590 (S.D.N.Y. 2022) (employer was entitled to discipline employee for "way and manner" of speech (quotation marks omitted)).

Cestaro's speculation that a factfinder might disagree with Pantzer's assessment that the phrase "obedient dog" is disrespectful (Br. at 18) also does not raise a triable issue of fact. In evaluating a First Amendment retaliation claim, courts look to the facts "as the employer *reasonably* found them to be," based on the amount of care that "a reasonable manager would use" in similar circumstances. *Waters*, 511 U.S. at 677-78 (emphasis in original). Here, there is no genuine factual dispute that Pantzer reasonably found Cestaro's use of the phrase insulting and racially charged (A. 293-294), even if others might disagree. Indeed, as Elias testified, he and several other members of the workers' compensation bar shared that view. (*See* A. 548-549, 551.)

Cestaro further errs in contending that the promotion would not have been revoked if he appeared in the video "merely sitting on a train with his mask down . . . without saying anything." *See* Br. at 27. The undisputed evidence established that Cestaro did not remain sitting

25

without saying anything; rather, he aggressively got out of his seat and followed the conductor while insulting and berating him. (*See* Video.) Had Cestaro sat silently, his *conduct* would have been different, i.e., he would not have engaged in the kind of unprofessional and demeaning conduct that undermined his suitability for a supervisory role. (*See* A. 128, 282, 401-404.)

## B. Defendants Would Have Revoked the Promotion Based on Cestaro's Refusal to Comply with New Jersey Transit Rules.

The undisputed record also established that defendants would have revoked the promotion because Cestaro failed to comply with NJT's clearly posted rules regarding face masks, regardless of Cestaro's speech about those rules. This additional, non-retaliatory reason independently supports the grant of summary judgment to defendants.

It is undisputed that, at the time of the incident, NJT riders were required to wear a face mask over their nose and mouth while onboard, and that riders were informed of this requirement on both their ticket and through posted signs. (*See* A. 174, 703 (NJ Executive Orders), 740 (ticket), Video (sign in train car).) It is also undisputed that Cestaro was

26

not wearing a mask over his nose and mouth, and that he refused to pull up his mask after being asked to do so by the conductor. (*See* Video.)

Cestaro's refusal to comply with NJT's generally applicable rules provided an additional basis for the revocation decision. Pantzer cited Cestaro's failure to comply with NJT's mask requirements as a basis for revoking the promotion. (A. 135.) And Pantzer and Wertheim each testified that Cestaro's refusal to comply with NJT's rules raised questions about his ability to follow rules and to ensure that employees he supervised did so as well. (*See* A. 314-315 (Pantzer), 401-402, 404-405 (Wertheim).)

Although Cestaro now suggests that his refusal to wear a mask was intended as a political symbol (*see* Br. at 3; A. 748), there is no evidence in the record to support this contention. To the contrary, Cestaro testified that he pulled down his mask to access his ticket, not to communicate any kind of message (A. 193). That Cestaro failed to wear a mask purportedly because of a visual impairment also does not undermine Pantzer and Wertheim's reasoning. *See* Br. at 28-29. It is undisputed that Cestaro never told the conductor that he purportedly could not wear a mask because of a visual impairment or that he was entitled to an exemption from the mask requirement for that reason (or any other reason). (*See*

27

Video; *see also* A. 193-194, 200.) It is also undisputed that neither Wertheim nor Pantzer was aware of Cestaro's visual impairment. (A. 262, 406-407.) Cestaro conceded that he wore a mask in the WCB's offices and on the New York City subways, and that he never sought an exemption from the WCB's mask requirements or claimed to anyone at the WCB that he could not wear a mask. (A. 180-183; *cf.* A. 707-710 (Cestaro's FMLA authorization, which makes no mention of his condition or inability to wear a mask).)

## C. Defendants Would Have Revoked the Promotion Because of the Reputational Risk to the WCB Caused by the Video of Cestaro's Conduct.

The summary judgment record established that defendants would have revoked the promotion for a third non-retaliatory reason, specifically, because the wide dissemination of the video showing Cestaro's unprofessional behavior was likely to hurt the WCB's reputation.

As this Court has consistently recognized, a public employer may discipline its employee for conduct that is disruptive or that undermines public trust without running afoul of the First Amendment's protections. *See Anemone*, 629 F.3d at 119-20. Here, the undisputed evidence established that Cestaro's behavior, and the broad dissemination on the

internet of the video reflecting that behavior, risked undermining the WCB's reputation. (*See* A. 119-120, 408, 411.) For example, Cestaro conceded that the video harmed his reputation as an ALJ. (A. 212-213.) And as Wertheim testified, this reputational harm could reasonably extend to the WCB, undermining the public's perception of the WCB's adjudicative process (*see* A. 408, 411).

This risk was exacerbated by the fact that the video had circulated widely among attorneys in the workers' compensation field and other constituents of the WCB, less than a week before Cestaro was scheduled to start as a supervisor. (*See* A. 212-213, 226, 551.) Indeed, as another WCB employee testified, the video caused an "uproar" among members of the workers' compensation community immediately after it was posted. (A. 639; *see also* A. 551 (Elias testifying that other attorneys he spoke with all responded negatively to the video).) And the video was brought to the WCB's attention by Elias, an attorney who regularly practices in front of the WCB and who expressed skepticism about Cestaro's ability

to fairly adjudicate claims brought by injured workers given the video.[3] (*See* A. 120, 225.) Ultimately, Cestaro does not meaningfully dispute that the WCB faced risk to its reputation and credibility because of the video.

In light of this undisputed evidence, Wertheim reasonably concluded that revoking the promotion was appropriate—and no reasonably jury could conclude that the decision was instead substantially motivated by retaliatory intent. Cestaro's receipt of positive feedback as an ALJ (Br. at 26) does not support the contrary conclusion. Unlike ALJs, Senior Compensation Claims Referees are supervisors who are responsible for enforcing the WCB's rules and standards of professional conduct and for "setting the tone" of the office they supervise. (A. 128, 155.) Supervisors, unlike ALJs, are also responsible for liaising with the WCB's various constituents, including members of the workers' compensation bar. (*See* A. 119, 128, 155.) Considering these additional responsibilities, Cestaro fails to raise any dispute of material fact about Wertheim's reasonable conclusion

---

[3] Cestaro's contention that Elias, the attorney who emailed the video to Pantzer, "personally disliked" Cestaro (Br. at 35) is irrelevant. There is no evidence that any WCB employee had any reason to know about Elias' purported dislike of Cestaro.

that Cestaro's behavior was more likely to harm the WCB's reputation if he was allowed to serve as a supervisor days after the video's dissemination.

## POINT II

### DEFENDANTS ARE ALSO ENTITLED TO SUMMARY JUDGMENT UNDER THE *PICKERING* BALANCING TEST

In any event, even if the revocation decision was substantially motivated by Cestaro's protected speech (which it was not), defendants would still be entitled to summary judgment under the *Pickering* balancing test. *See* 391 U.S. at 568. Although the district court did not reach this issue, the Court can affirm on this independent, alternative ground because it is amply supported by the undisputed record. *See Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015).

As the Supreme Court has explained, the State "has interests as an employer in regulating the speech of its employees" that are different from, and more substantial than, its interest in regulating private speech by members of the public. *Pickering*, 391 U.S. at 568. Accordingly, the government as an employer "may impose restraints on the First Amendment activities of its employees . . . even when such restraints would be unconstitutional if applied to the public at large." *Melzer v. Board*

31

*of Educ. of City Sch. Dist. of City of New York*, 336 F.3d 185, 192 (2d Cir. 2003). Where a public employer does so, the court must balance the interest of the employee, "as a citizen, in commenting upon matters of public concern," with the interests of the State, "as an employer, in promoting the efficiency of the public services it performs" and in preventing disruption in the workplace. *Pickering*, 391 U.S. at 568. Under this test, the employer is not required to establish actual disruption; rather, it is enough for the employer to provide evidence that its "prediction of disruption is reasonable." *Sheppard v. Beerman*, 317 F.3d 351, 355 (2d Cir. 2003).

In balancing these competing considerations, courts analyze a variety of factors, including the "manner, time, and place" in which the purportedly protected speech was made. *Connick v. Myers*, 461 U.S. 138, 152 (1983). For example, courts have recognized that speech that is disrespectful or derogatory can be particularly disruptive and therefore "is entitled to less weight in the *Pickering* balance." *Curran v. Cousins*, 509 F.3d 36, 49 (1st Cir. 2007); *see, e.g.*, *Sheppard*, 317 F.3d at 355.

Courts also consider the nature of the employer's public function, including the employer's reliance on its "perception in the community" as

fair and evenhanded to perform its essential functions. *See, e.g.*, *Pappas v. Giuliani*, 290 F.3d 143, 146 (2d Cir. 2002). And courts will consider the nature of the employee's position within the organization, recognizing that expressive activity by a supervisor or policymaker is more likely to be disruptive than the same activity by a lower-level employee. *See Faghri v. University of Conn.*, 621 F.3d 92, 98 (2d Cir. 2010)

Here, each of these factors weighs in favor of the defendants. First, Cestaro's demeaning comments to the conductor, including his reference to the conductor being an "obedient dog" (see *supra* at 8-10, 21-26), are entitled to little weight in the *Pickering* balancing test. Second, as explained above (at 28-31), the undisputed record demonstrated that defendants reasonably predicted that Cestaro's unprofessional conduct and the broad dissemination of the video risked harm to the WCB's reputation and disruption to its adjudicatory processes. Third, this risk to the WCB's legitimacy was particularly acute because the WCB, as an adjudicative body, depended on the public's perception of its adjudicative processes as fair and even-handed to effectively resolve workers' compensation disputes. *See Davi v. Hein*, No. 21-719, 2023 WL 2623205, at *3 (2d Cir. Mar. 24, 2023) (weighing the risk that employee's speech

may undermine a state agency's reputation "by suggesting that its hearing officers were biased or unprofessional").

Contrary to Cestaro's contention (Br. at 35), the fact that only one attorney who regularly practices before the WCB complained about the video directly to Pantzer does not undermine the validity of defendants' assessment of the reputational risk posed by the video.[4] The video had circulated broadly among attorneys and others affected by the work of the WCB, many of whom found Cestaro's conduct offensive. (*See, e.g.*, A. 119-120, 226, 551, 639.) And at least one other WCB employee received complaints about the video from members of the workers' compensation community. (*See* A. 202-203.)

Defendants' prediction of disruption was further supported by the manner, time, and place of the speech at issue. *See Connick*, 461 U.S. at 152. Specifically, Cestaro's comments were directed to a public worker in an unprofessional and demeaning manner. The video circulated at a time when the WCB was starting to adjudicate claims filed by workers alleging

---

[4] Appellant's brief mistakenly identifies the complainant as Mark Grodsky, a WCB employee. *See* Br. at 35. However, it is undisputed that the complaint came from Elias, an attorney who regularly practices before the WCB, not from a WCB employee. (*See, e.g.*, A. 138.)

exposure to COVID-19 in the workplace due to unmasked individuals. (*See* A. 535-536.) And defendants' interest in preventing disruption was heightened by the fact that Cestaro was scheduled to start as a supervisor with management responsibilities and more public contact with the WCB's key constituencies within days of the video's circulation. *See Faghri*, 621 F.3d at 98; *McEvoy v. Spencer*, 124 F.3d 92, 98-99 (2d Cir. 1997) (*Pickering* balance weighed more heavily in employer's favor where employee was removed from management position).

## POINT III

### DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY FROM THE PERSONAL CAPACITY CLAIMS

This Court can affirm the district court's grant of summary judgment to MacMaster, Wertheim, and Pantzer on the personal capacity claims for the additional, independent reason that all three defendants are entitled to qualified immunity.

It is well established that public officers are entitled to qualified immunity unless the challenged action "violate[s] clearly established statutory or constitutional rights of which a reasonable person would have known." *Danahy v. Buscaglia*, 134 F.3d 1185, 1190 (2d Cir. 1998)

(emphasis omitted). In the context of a First Amendment claim, the relevant inquiry is not whether the defendants "should have known that there was a federal right, in the abstract, to 'freedom of speech,'" but rather whether the defendants reasonably should have known that their specific actions violated the plaintiff's freedom of speech under the specific circumstances presented. *Lewis v. Cowen*, 165 F.3d 154, 166-67 (2d Cir. 1999); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) (the qualified immunity analysis should not "define clearly established law at a high level of generality.").

Here, defendants are entitled to qualified immunity under this standard. As explained above (at 21-31), it was objectively reasonable for defendants to conclude, in light of this Court's precedent, that they could revoke the promotion in response to Cestaro's unprofessional behavior, captured on video, and the risk that behavior posed to the WCB's reputation without running afoul of the First Amendment. *See Greenwich Citizens Comm., Inc.*, 77 F.3d at 33; *Anemone*, 629 F.3d at 114. Moreover, the undisputed record plainly does not support the inference that the *Pickering* balancing test tips so clearly in Cestaro's favor "that his superiors can

properly be said to have forfeited their qualified immunity." *See Giacalone v. Abrams*, 850 F.2d 79, 86 (2d Cir. 1988).

## CONCLUSION

For the foregoing reasons, the district court's grant of summary judgment should be affirmed.

Dated:  New York, New York
        December 12, 2024

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*
Attorney for Appellees

By:   /s/ Anagha Sundararajan
ANAGHA SUNDARARAJAN
Assistant Solicitor General

BARBARA D. UNDERWOOD          28 Liberty Street
  *Solicitor General*          New York, NY 10005
JUDITH N. VALE                (212) 416-8073
  *Deputy Solicitor General*
ANAGHA SUNDARARAJAN
  *Assistant Solicitor General*
    *of Counsel*

37

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Ava Mortier, an employee in the Office of the Attorney General of the State of New York, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 6,906 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

_/s/ Ava Mortier_